**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------- X

IN RE SOUTH AFRICAN APARTHEID
LITIGATION

---------------------------------------------------- X

**This Document Relates to:**
---------------------------------------------------- X

**SAKEWE BALINTULO,** *et al.,*

        **Plaintiffs,**

  - against -

**DAIMLER AG,** *et al.,*

        **Defendants.**

---------------------------------------------------- X

**OPINION & ORDER**

**02 MDL 1499 (SAS)**

**03 Civ. 4524 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/25/09

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**1.    INTRODUCTION**

       Two actions brought on behalf of massive classes of South Africans ("plaintiffs") assert that several multinational corporations ("defendants") aided and abetted torts in violation of customary international law.  Plaintiffs claim

1

jurisdiction in United States courts under the Alien Tort Claims Act ("ATCA").[1]

These lawsuits address the obligations of corporations under the law of nations,

the role of American courts in enforcing universal norms of international law, and

the legacy of South African apartheid.

      The long procedural history of these cases dates back to the filing of

complaints in 2002.  On April 8, 2009, this Court granted in part and denied in

part defendants' consolidated motion to dismiss these actions in their entirety.[2]

Specifically, this Court dismissed plaintiffs' claims against Fujitsu Limited with

leave to replead.[3]  On May 19, 2009, the *Balintulo* plaintiffs submitted a Corrected

Second Amended Complaint ("CSAC"), which now governs their action.  Fujitsu

now moves to dismiss the claims against it on the basis that plaintiffs have not

presented plausible allegations of an agency relationship between Fujitsu and

International Computers Limited ("ICL"), the company whose actions form the

---

[1]    28 U.S.C. § 1350.  This provision is alternatively known as the Alien
Tort Statute ("ATS").

[2]    *See In re S. Afr. Apartheid Litig.* ("*Apartheid II*"), No. 02 MDL 1499,
2009 WL 960078 (S.D.N.Y. Apr. 8, 2009).  *See also In re S. Afr. Apartheid Litig.*
("*Apartheid III*"), No. 02 MDL 1499, 2009 WL 1579093 (S.D.N.Y. May 27, 2009)
(denying reconsideration).

[3]    *See Apartheid II*, 2009 WL 960078, at *24 & n.283.

core of the relevant allegations.[4]  For the reasons stated below, Fujitsu's motion to

dismiss is granted.

## II.   BACKGROUND

### A.   ICL Sales to South Africa

Plaintiffs contend that ICL supplied the South African government

with computers used "to restrict Black people's movements within the country, to

track non-whites and political dissidents, and to target individuals for the purpose

of oppressing the Black population and perpetuating the apartheid system."[5]

Specifically, in 1965 ICL contracted with the South African government to design,

implement, and service a customized computer system used to implement South

Africa's racial pass laws, a crucial component of apartheid.[6]  In 1967, ICL

installed a computer at the Bantu Reference Bureau, which maintained geographic

population control and served as an arm of the central government in the racially

segregated townships.[7]  In 1976, ICL delivered a more advanced computer to

---

[4]      *See* Memorandum of Law in Support of Defendant Fujitsu Limited's
Motion to Dismiss Plaintiffs' Second Amended Complaint ("Def. Mem.") at 9-21.

[5]      CSAC ¶ 172.

[6]      *See id.* ¶¶ 182-186, 189-191.

[7]      *See id.* ¶¶ 187-188.

3

upgrade the existing system, despite protests in the United Kingdom.[8]

After the passage of United Nations resolutions concerning trade with South Africa and implementation of a partial trade embargo by the United States in the late 1970s, South Africa organized a front organization called Infoplan to procure technical equipment for the security forces.[9]  ICL maintained links with Infoplan and continued to supply the South African security forces with technology products, despite the imposition of international sanctions.[10]  In 1982, the United States fined ICL for selling computers containing U.S.-origin disk drives to the South African Police, in violation of U.S. trade restrictions.[11]

In 1986, the South African Government repealed the pass laws.[12] Although a formal agreement for non-racial elections was made in 1993, the apartheid regime did not officially end until 1994 with the election of Nelson Mandela in the first universal suffrage general election in South African history.[13]

---

[8]     *See id.* ¶¶ 194-195

[9]     *See id.* ¶¶ 197-198.

[10]    *See id.* ¶¶ 195-198.

[11]    *See id.* ¶ 202.

[12]    *See* Identification Act 72 of 1950, § 23 (S. Afr.).

[13]    *See* CSAC ¶¶ 81-82.

**B.    The Relationship Between Fujitsu and ICL**

Fujitsu is an information technology and electronics corporation headquartered in Tokyo, Japan.[14] One of Fujitsu Limited's many subsidiaries is Fujitsu Services Limited ("Fujitsu Services"), which is the successor corporation of ICL.[15] In 1981, ICL began a collaborative relationship with Fujitsu, under which ICL received advanced access to Fujitsu semiconductor technology.[16] This technology was "crucial to ICL's continued supply of computers in South Africa."[17] In light of this relationship, Fujitsu "implemented elaborate guidelines about procedures to ensure it was knowledgeable about actions taken at ICL."[18] Over the course of the next twenty years, Fujitsu's relationship with ICL deepened, and plaintiffs allege that "Fujitsu's management played an increasing role in directing ICL's business activities."[19] In 1990, Fujitsu acquired an eighty-

---

[14]    *See id.* ¶ 32.

[15]    *See id.*

[16]    *See id.* ¶ 200.

[17]    *Id.*

[18]    *Id.* ¶ 201.

[19]    *Id.* ¶¶ 201-202.

percent stake in ICL, and by 1998 Fujitsu had complete ownership.[20] "In 2001, ICL changed its name to Fujitsu Services Ltd."[21]

## III.  APPLICABLE LAW

### A.  Motion to Dismiss - Rule 12(b)(6)

When deciding a motion to dismiss under Rule 12(b)(6), the court must "accept as true all of the factual allegations contained in the complaint"[22] and "draw all inferences in the light most favorable to the non-moving party[]."[23] Nevertheless, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness."[24]

In deciding a motion to dismiss, the court is not limited to the face of the complaint.  The court "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in

---

[20]  *See id.* ¶ 172 n.117.

[21]  *Id.*

[22]  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[23]  *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

[24]  *Id.* (quotation omitted).

bringing the suit."[25]

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and

plain statement of the claim showing that the pleader is entitled to relief.'"[26] To

survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet

the standard of "plausibility."[27]

> A claim has facial plausibility when the plaintiff pleads
> factual content that allows the court to draw the reasonable
> inference that the defendant is liable for the misconduct
> alleged. The plausibility standard is not akin to a
> "probability requirement," but it asks for more than a sheer
> possibility that a defendant has acted unlawfully. Where a
> complaint pleads facts that are "merely consistent with" a
> defendant's liability, it "stops short of the line between
> possibility and plausibility of entitlement to relief."[28]

## B.   Vicarious Liability

"It is well established that traditional vicarious liability rules

ordinarily make principals or employers vicariously liable for acts of their agents

---

[25]   *ATSI Commc'ns v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007).

[26]   *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

[27]   *See Twombly*, 550 U.S. at 564. *Accord Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1941 (2009) (noting the *Twombly* plausibility requirement is not limited to antitrust cases).

[28]   *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556-57).

. . . in the scope of their authority."[29]  "[J]ust as one corporation can hire another to

act as its agent, a parent can commission its subsidiary to do the same."[30]

However, "a parent corporation is not liable for acts of its subsidiaries simply

because it owns the subsidiary's stock."[31]  The level of control necessary to form a

principal-agent relationship between a parent company and subsidiary "defies

resolution by 'mechanical formula[e],' for the inquiry is inherently fact-specific."[32]

Under federal common law,

> the relationship of principal and agent does not obtain
> unless the parent has manifested its desire for the
> subsidiary to act upon the parent's behalf, the subsidiary
> has consented so to act, the parent has the right to exercise
> control over the subsidiary with respect to matters
> entrusted to the subsidiary, and the parent exercises its
> control in a manner more direct than by voting a majority
> of the stock in the subsidiary or making appointments to
> the subsidiary's Board of Directors.[33]

---

[29]    *Meyer v. Holley*, 537 U.S. 280, 285 (2003).

[30]    *Royal Indus. Ltd. v. Kraft Foods, Inc.*, 926 F. Supp. 407, 413
(S.D.N.Y. 1996).

[31]    Restatement (Third) of Agency § 1.01 cmt. f(2) (citing *United States
v. Bestfoods*, 524 U.S. 51, 62 (1998)).

[32]    *Transamerica Leasing, Inc. v. Republica de Venezuela*, 200 F.3d 843,
849 (D.C. Cir. 2000) (quoting *First Nat'l City Bank v. Banco Para El Comercio
Exterior de Cuba*, 462 U.S. 611, 633 (1983)).

[33]    *Id.* (citing Restatement (Second) of Agency § 1). *Accord Itel
Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 909 F.2d 698, 702-03 (2d

Circumstantial evidence of a principal-agent relationship includes the exclusive

dedication of a subsidiary to assisting the parent company, payment of the

subsidiary's expenses by the parent company, and requests for approval of the

parent company for important decisions by the subsidiary.[34]

Even if a purported agent lacks actual authority, a principal is

nonetheless liable "if it ratified the illegal acts."[35]  "'Ratification is the affirmance

by a person of a prior act which did not bind him but which was done or

professedly done on his account, whereby the act, as to some or all persons, is

given effect as if originally authorized by him.'"[36] The acts of an agent are

imputed to the principal "if the principal adopts the unauthorized act of his agent

---

Cir. 1990) (establishing similar standards concerning express and implied agency).

[34]     *See Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95-96 (2d Cir. 2000). *See also In re Parmalat Secs. Litig.*, 375 F. Supp. 2d 278, 295 (S.D.N.Y. 2005) (seeking "direction and help" from the parent company creates a plausible inference of agency).

[35]     *Phelan v. Local 305 of the United Ass'n of Journeymen*, 973 F.2d 1050, 1062 (2d Cir. 1992). *Accord Doro v. Sheet Metal Workers Int'l Ass'n*, 498 F.3d 152, 156 (2d Cir. 2007) (recognizing that common law agency principles extend the right to sue a principal that ratifies the illegal act of an agent).

[36]     *Hamm v. United States*, 483 U.S. 135, 140 (2d Cir. 2006) (quoting Restatement (Second) of Agency § 82 (1958)). *Accord Phelan*, 973 F.2d at 1062 ("Ratification occurs 'when the principal, having knowledge of the material facts involved in a transaction, evidences an intention to ratify it.'" (quoting *Rodonich v. House Wreckers Union Local 95*, 817 F.2d 967, 973 (2d Cir. 1987))).

in order to retain a benefit for himself."[37] Even mere acquiescence is sufficient to infer adoption of wrongdoing.[38] "Ratification also may be found to exist by implication from a principal's failure to dissent within a reasonable time after learning what had been done."[39]

## III.   DISCUSSION

Only a limited period of time is relevant to the claim that ICL acted as Fujitsu's agent when providing substantial assistance to violations of customary international law committed by the apartheid-era South African government.  On the one hand, "ICL's relationship with Fujitsu began in 1981."[40]  On the other hand, the pass laws were repealed in 1986.  This Court previously held that

> the sale of computers to the South African Defense Forces does not constitute aiding and abetting any and all violations of customary international law that the military committed, as computers are not the means by which those violations were carried out.[41]

---

[37]   *Munroe v. Harriman*, 85 F.2d 493, 495 (2d Cir. 1936).

[38]   *See In re Bennett Funding Group*, 336 F.3d 94, 101 (2d Cir. 2003).

[39]   *IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 375 (2d Cir. 1994).  *Accord Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1388 (9th Cir. 1987) (noting that attempting to conceal an agent's misdeeds rather than remedy them supports an inference of ratification).

[40]   CSAC ¶ 200.

[41]   *Apartheid II*, 2009 WL 960078, at *19.

Therefore broader allegations of ICL sales to South Africa after 1986 – including the entire period during which Fujitsu held an ownership stake in ICL – are irrelevant to plaintiffs' surviving claim concerning aiding and abetting the crime of apartheid.[42]  Three of the four dated events referenced in the Complaint occurred in the 1960s and 1970s.  The only dated activity post-dating the formation of the relationship between Fujitsu and ICL is the levying of fines by the United States against ICL in 1982 for the sale of U.S.-origin computer equipment to the South African Police.[43]  This sole allegation is buttressed by alleged improvement and maintenance activities performed by ICL personnel on the existing pass law computer systems.

Although plaintiffs' allegations would undoubtedly be sufficient to state a cause of action against ICL, plaintiffs have failed to sufficiently tie these activities to Fujitsu.  The relevant relationship between ICL and South Africa concerned the design and maintenance of systems that predated any relationship with Fujitsu.  Nor have plaintiffs alleged that Fujitsu had the right to command

---

[42]    *See id.* (dismissing plaintiffs' claims against Fujitsu concerning "extrajudicial killing, torture, prolonged unlawful detention, and CIDT").

[43]    Although it is possible that the 1982 fine concerned sales prior to 1981 or sales unrelated to the pass law system, on a motion to dismiss the Court may infer in plaintiffs' favor that the fine evinces relevant sales.

11

ICL to sever that long-term relationship. Although Fujitsu allegedly maintained a

preferential supply agreement with ICL and monitored the use of Fujitsu

technology, these claims do not support a broad inference that ICL acted as

Fujitsu's agent, pursuant to Fujitsu's control. An otherwise unsupported assertion

that this supply relationship correlated with Fujitsu management playing "an

increasing role in directing ICL's business activities" does not suffice to sustain a

plausible claim that ICL acted as Fujitsu's agent in carrying out sales in South

Africa, particularly concerning a preexisting customer relationship.[44]

The insufficiency of plaintiffs' allegations against Fujistu is clearest

when compared to the claims lodged against Ford, GM, Daimler, and IBM. This

Court previously found that plaintiffs' allegations against those companies are

---

[44]      CSAC ¶ 200. Although Plaintiffs cite the Second Circuit's recent
decision in *Abdullahi v. Pfizer*, 562 F.3d 163 (2d Cir. 2009), in support of the
sufficiency of their allegations, *see* Def. Mem. at 9-10, *Abdullahi* is inapposite. In
addressing the analytically distinct question of whether Pfizer acted under the
color of law, the plaintiffs in *Abdullahi* offered significantly more specific
allegations concerning Pfizer's links to the Nigerian government with regard to the
particular incident. *See* 562 F.3d at 188 (noting that the Nigerian government
"provided a letter of request to the FDA," "extended the exclusive use of two
hospital wards," "provid[ed] Pfizer with control over scarce public resources and
the use of the hospital's staff and facilities," and "conspired to cover up the
violations by silencing Nigerian physicians critical of the test and by back-dating
an 'approval letter,'" as well as providing more general backing).

12

sufficient to state a claim derived from vicarious liability for the acts of an agent.[45]

For example, plaintiffs alleged that Ford South Africa "relied on American

management" – noting the precise position held by American personnel – and used

parts shipped from Ford Canada and Ford England, in order to sell Ford vehicles

without running afoul of U.S. trade restrictions."[46]  Similarly, plaintiffs alleged

that "IBM engaged in a campaign to deliver products to South Africa in

circumvention of export controls implicitly involving U.S. management."[47]  The

provision of financial and technical support is categorically different from the

installation of management personnel in a subsidiary or consultation with a parent

company's executives, as only the latter suggests authority to direct or control the

alleged agent.

Plaintiffs have failed to state a claim against Fujitsu for substantially

assisting the violations of customary international law carried out by the apartheid-

era government of South Africa.  Therefore, plaintiffs' claims against Fujitsu must

be dismissed.

---

[45]     *See Apartheid II*, 2009 WL 960078, at \*23-\*24.

[46]     *Id.* at \*23 (citing Complaint, *Ntsebeza v. Daimler A.G.*, Nos. 02 Civ.
4712, 02 Civ. 6218, 03 Civ. 1024 ("*Ntsebeza* Complaint"), ¶¶ 101-102).

[47]     *Id.* at \*24 (citing *Ntsebeza* Complaint ¶¶ 129-130, 140).

## IV.   CONCLUSION

For the foregoing reasons, Fujitsu's motion to dismiss is granted. Absent significant new allegations concerning ties between Fujitsu and ICL, any request for leave to amend the Corrected Second Amended Complaint will be denied as futile.  The Clerk of the Court is ordered to close this motion (02 MDL 1499, No. 153, and 03 Civ. 4524, No. 83).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            June 25, 2009

14

## - Appearances -

**For Plaintiffs Balintulo *et al.*:**

Michael D. Hausfeld, Esq.
Hausfeld LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
(202) 579-1089

Steig D. Olson, Esq.
Hausfeld LLP
11 Broadway, Suite 615
New York, New York 10004
(212) 830-9850

Matt Schultz, Esq.
Levin Papantonio Thomas Mitchell
    Echsner & Proctor, P.A.
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
(850) 435-7140

Robert G. Kerrigan, Esq.
Kerrigan, Estess, Rankin & McLeod,
    LLP
627 East Government Street
Pensacola, Florida 32502
(850) 444-4402

**For Defendant Fujitsu Limited:**

Michael Gerard, Esq.
Mark David McPherson, Esq.
Morrison Foerster
1290 Avenue of the Americas
New York, New York 10104
(212) 468-8000

Jack W. Londen, Esq.
Peter J. Stern, Esq.
Morrison & Foerster, LLP
Shin-Marunouchi Building, 29th Floor
5-1, Marunouchi 1-chome
Chiyodaku, Tokyo 100-6529
JAPAN
+81 3-3214-6522