UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------ X

IN RE SOUTH AFRICAN APARTHEID
LITIGATION

02 MDL 1499 (SAS)

------------------------------------------ X

This Document Relates to:

------------------------------------------ X

LUNGISILE NTSEBEZA , *et al.,*
                                    Plaintiffs,
      -against-

FORD MOTOR COMPANY and
INTERNATIONAL BUSINESS
MACHINES  CORPORATION,

            Defendants.

02 Civ. 4712 (SAS)
02 Civ. 6218 (SAS)
02 Civ. 1024 (SAS)

------------------------------------------ X

SAKWE BALINTULO, *et al.,*

                        Plaintiffs,
      -against-

FORD MOTOR COMPANY and
INTERNATIONAL BUSINESS
MACHINES  CORPORATION,

            Defendants.

03 Civ. 4524 (SAS)

------------------------------------------ X

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS**

**TABLE OF CONTENTS**

**Page**

Table of Authorities .................................................................................................ii

Introduction ...........................................................................................................1

Argument................................................................................................................3

I.  This Court Should Grant Plaintiffs' Motion for Leave to Amend their Complaints ..........3

II.  Ford and IMB's U.S. Citizenship Satisfy the "Touch and Concern" Standard .................3

III.  Even if this Court Determines that U.S. Citizenship is Insufficient under *Kiobel II*, Both IBM and Ford Conducted Substantial Activities in the U.S. to Purposefully Assist Abuses, Which is Sufficient to Overcome the *Kiobel II* Presumption ....................4

IV.  Allegations Demonstrating that the Claims against IBM Involved Purposeful Conduct and Touch and Concern the United States.........................................................5

　　A.  IBM's Policies Regarding South Africa and its Operations Were Directed from the United States ........................................................................................6

　　B.  IBM Purposefully Provided Substantial Assistance to the Functioning and Maintenance of the Apartheid System.......................................................13

　　C.  IBM's "Divestment" from South Africa ...........................................................17

V.  Allegations Demonstrating that the Claims Against Ford Involved Purposeful Conduct and Touch Concerned the United States...........................................................18

　　A. Ford's Actions in South Africa Were Directed from the United States .....................18

　　B. Ford's Involvement in South Africa Purposefully Provided Substantial Assistance to the Functioning and Maintenance of the Apartheid System...................................23

　　C. Ford's "Withdrawal" from South Africa............................................................25

Conclusion............................................................................................................26

i

## TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Chowdhury v. Worldtel Bangladesh Holding Ltd.*, 746 F.3d 42 (2d Cir. 2014) ..........................3,4

*Daimler AG v. Bauman*, 134 S. Ct. 746 (2014) ...........................................................2

*Du Daobin v. Cisco Systems, Inc.*, No. PJM 11-1538, 2014 WL 769095
    (D. Md. Feb. 24, 2014) ...........................................................................4

*Kiobel v. Royal Dutch Petroleum, Inc.*, 133 S. Ct. 1659 (2013) .........................................passim

*New York SMSA Ltd. Partnership v. Town of Hempstead*, 2013 WL 1148898
    (E.D.N.Y. Mar. 19, 2013)........................................................................3

*Park B. Smith, Inc. v. CHF Industries, Inc.*, 811 F. Supp. 2d 766 (S.D.N.Y. 2011)......................3

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009) .................1

*Sexual Minorities Uganda*, 960 F. Supp. 2d 304 (D. Mass. 2013)........................................4

*Smart v. Arnone*, 315 F. Supp. 2d 292 (W.D.N.Y. 2004) ...............................................3


**Rules & Statutes**

Fed. R. Civ. P. 15(a)(2)...........................................................................3

Alien Tort Statute 28 U.S.C. § 1350................................................................3,4


**Other**

Barnaby J. Feder, "IBM Is Shedding South Africa Unit; Pressure Is Cited,"
    The New York Times, Oct. 22, 1986 ...........................................................10

Biography of Lewis Booth, Ford Motor Co., U.S. Dept. of State,
    available at http://2001-2009.state.gov/e/eeb/ace/2001/80311.htm..............................22

Computer Weekly, United Kingdom, March 31, 1978..................................................11

David Sanger, "South African Prospects Leave I.B.M. Chief Glum,"
    New York Times, April 1986. .................................................................*11*

Deon Sonnekus, *Samcor becomes Ford of Southern Africa*, News24, Aug. 21, 2000, ............... 19
available at
http://www.news24.com/xArchive/Archive/Samcor-becomes-Ford-of-Southern-Africa-20000821

E. Drake Lundell, Jr., *Churches Hit IBM Inaction on Rights in South Africa*, ........................... 10
COMPUTERWORLD, May 29, 1978

Elizabeth Schmidt, DECODING CORPORATE CAMOUFLAGE, 61 ..................................................... 6
(Institute for Policy Studies, 1980) Appendix I "Signatories to the Sullivan Principles"

Ford Motor Co. (1989) Form 10-K 1989

Ford Motor Co. (1989) Annual Report 1986, at Unnumbered "Centers of Excellence", ............ 21
Ford Motor Co. (2012) Sustainability Report: Environmental Management 2012,
available at http://corporate.ford.com/microsites/sustainability-report-2011-12/blueprint- .
governance-management-environmental; Ford Motor Co. (2012)

*Ford to dispose of its stake in South Africa's Samcor*, The Wall Street Journal Europe, ............ 22
Nov. 25, 1987 WSJ

IBM Highlights, 1885-1969, available at ........................................................,............................... 6
http://www-03.ibm.com/ibm/history/documents/pdf/1885-1969.pdf.

Interview with C. Cotton, Managing Director, Burroughs South Africa, ...................................... 8
in Johannesburg, South Africa (Mar. 3, 1971).

John Battersby, *South Africa Sale by Ford Will Give Blacks Big* Stake, ................................... 19
N.Y. Times, June 15, 1987

John Pickles and Jeff Woods, "Undermining Disinvestment: From a Marginal ......................... 8
Propensity to Invest to a Propensity to Invest in the Margins," Africa Today,
Vol. 37, No. 2, *Dismantling Apartheid: Problems and Possibilities* (2nd Qtr., 1990)

Judy Claude, *Computing Apartheid: The Role of U.S. Customer Companies in South* Africa, ...... 7
(June 1978), available at http://kora.matrix.msu.edu/files/50/304/32-130-1368-84-
cic%206-78%20opt.pdf.

ICCR Brief Vol. 16 No. 5p. 3A 1987 ........................................................................................ 10

IBM Workers United, *IBM: Speak Up! The Truth about the Company in South Africa* ............. 16
(Johnson City, New York, 1979), available at
http://africanactivist.msu.edu/document_metadata.php?objectid=32-130-14BA.

iii

Kenneth Propp and Desaix Myers III, "The Motor Industry in South Africa," .......................... 19
    South Africa Review Service: Industry Sector Report (February 1979) by the
    Investor Responsibility Research Center (IRRC), at 2-4, 6

Kevin Danaher, IN WHOSE INTEREST? A GUIDE TO U.S.-SOUTH ................................................. 8
    AFRICA RELATIONS 116 (1984)

Lawrence Litvak et al., SOUTH AFRICA: FOREIGN INVESTMENT AND APARTHEID, ....................... 7
    50 (Institute for Policy Studies 1978), see also Edwards and Hecht, at 619 (2010)

NARMIC/AMERICAN FRIENDS SERVICE COMMITTEE, AUTOMATING APARTHEID: ....................... 7
    U.S. COMPUTER EXPORTS TO SOUTH AFRICA AND THE ARMS EMBARGO, 10-12 (1982)

Ntsebeza v. Citigroup, Inc., 02-cv-04712-SAS (Oct. 27, 2008)............................................. 24,24

Paul N. Edwards & Gabrielle Hecht, History and the Technopolitics of Identity:...................... 7,8
    The Case of Apartheid South Africa, 36 J. S. AFR. STUD. 630 (2010).

Penske Corp., Case Study: Ford Motor Company (2010), ....................................................... 22
    available at http://www.penskelogistics.com/pdfs/01_ford_case_study_updated.pdf

Ranjay Gulati, REORGANIZE FOR RESILIENCE. (Harvard Business School Publishing .................. 6
    Corporation, 2009).

Renate Pratt, IN GOOD FAITH: CANADIAN CHURCHES AGAINST APARTHEID 43 ..................... 21,22
    (Canadian Corporation for Studies in Religion, 1997), available at
    http://books.google.com/books?id=KII0T9N7NzcC&pg=PA42&lpg=PA42&dq=ford+apartheid
    &source=bl&ots=ZTidly_iZV&sig=S9I1B0YFO6csH5tZ8GUXSoVXII4&hl=en&sa=X&ei=inN_
    U5XhLs6osASGtICgAQ&ved=0CC0Q6AEwAThu#v=onepage&q=ford%20apartheid&f=false

Richard Knight, U.S. Computers in South Africa, The Africa Fund, 1986, available at ................ 7
    http://richardknight.homestead.com/files/uscomputers.htm

Richard Leonard, IBM Update: Still Computing Apartheid, 16 ICCR Brief 3A (1987), ............ 10
    available at
    http://kora.matrix.msu.edu/files/50/304/32-130-1363-84-cic%20No5-87%20opt.pdf

Rita Arditti, et al., SCIENCE AND LIBERATION 204 (1980), available at............................... 12
    http://books.google.com/books?id=rE4SnULjDgQC&pg=PA204&lpg=PA204&dq=ibm+
    west+german+subsidiary+hitachi+south+africa+embargo&source=bl&ots=V1YBG79BUc&sig=
    8sY5umobUsRtMd9CGAaa31Dt-NY&hl=en&sa=X&ei=DMeIU_qmDeHEsATRx4C4Dw&ved=
    0CCgQ6AEwAA#v=onepage&q=ibm%20west%20german%20subsidiary%20hitachi%20south%
    20africa%20embargo&f=false.

South Africa History Online, *The Company, IBM, re-forms in South Africa*, ............................ 17
    (Oct. 21, 1986), available at
    http://www.sahistory.org.za/dated-event/company-ibm-re-forms-south-africa

Sustainability Report: Ethical Business Practices 2012, available at ........................................ 22
    http://corporate.ford.com/microsites/sustainability-report-2011-12/blueprint-governance-.
    sustainability-ethical.

*Testimony from the American Friends Service Committee Concerning U.S. Controls on* ............ 7
    *Exports to South Africa: Hearing Before the Subcomm. on Afr. and the Subcomm.*
    *On Int'l Econ. Policy & Trade of the H. Comm. on Foreign Affairs*, 97th Cong.
    (1982) (statement of Thomas Conrad, Staff Researcher, American Friends
    Service Committee), available at http://kora.matrix.msu.edu/files/50/304/32-130-1A83-...
    84-AFSC_SA_Testimony_feb9_1982_opt.pdf.

*The Hidden Entitlements*, CTJ, available at http://www.ctj.org/hid_ent/part-2/part2-3.htm ......... 7

Thomas Conrad, Letter to the Editor, *Machines that Help Make Apartheid Run*, N.Y. TIMES, ... 12
    May 18, 1985, available at http://www.nytimes.com/1985/05/18/opinion/l-machines-that-
    help-make-apartheid-run-249678.html.

Thomas W. Malone, *Making the Decision to Decentralize*, WORKING KNOWLEDGE ................... 6
    (Mar. 29, 2004), available at http://hbswk.hbs.edu/archive/4020.html#1
    (citing Louis V. Gerstner Jr., *Who Says Elephants Can't Dance? Inside IBM's*
    *Historic Turnaround* (New York: HarperBusiness, 2002))

Wall Street Journal, August 24, 1987 ................................................................................ 17

William Howard, *South Africa Resolution is Defeated*, PALM BEACH POST, ............................ 13
    Apr. 26, 1988, at 6B, available at .... http://news.google.com/newspapers?nid=1964&dat=
    19880426&id=4iMjAAAAIBAJ&sjid=js4FAAAAIBAJ&pg=2658,4149529.

# INTRODUCTION

This Court's April 17, 2014 Order required Plaintiffs to address two issues: (1) whether, under *Kiobel v. Royal Dutch Petroleum, Inc.*, 133 S. Ct. 1659 (2013) ("*Kiobel II*"), Plaintiffs can plead that their claims touch and concern the United States with sufficient force to overcome the presumption against extraterritoriality, and (2) whether, consistent with *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009), Plaintiffs can plead that Defendants acted with purpose to aid and abet apartheid and associated human rights violations.

Plaintiffs' claims touch and concern the United States because two U.S. corporations, IBM and Ford, directed and controlled the operations of their subsidiaries and agents in South Africa, particularly by making critical decisions in the United States related to Plaintiffs' claims. IBM and Ford intentionally supported the apartheid government, including the military and police, with sales and lease of technology and vehicles, as well as with management, technical advice, maintenance, and expertise. This purposeful support was essential for the effective enforcement of apartheid, including denationalization and the torture and killings of black South Africans. Defendants vigorously opposed U.S. efforts to prevent them from providing support and goods from the United States to South Africa, and acted to circumvent U.S. sanctions.

Defendants acted with purpose to aid and abet the South African government to enforce and maintain apartheid. While certain of Defendants' sales in South Africa had civilian uses, IBM and Ford also purposefully and intentionally supported apartheid and the security forces. IBM deliberately and purposefully leased, sold, and maintained computer hardware and software to the South African and homeland governments, including technology specifically designed for Bophuthatswana that was essential to the denationalization of black South Africans. Ford deliberately and purposefully supplied specialized vehicles used by the police and security forces

against the black population, and cooperated with the security forces in repressing employee opposition to apartheid and targeting and causing the torture of individual union leaders.

Defendants' opposition to efforts to prevent them from selling or leasing materials to the South African security forces, and their affirmative steps to circumvent U.S. sanctions regimes, demonstrate their intention to facilitate apartheid. U.S. company officials of both IBM and Ford recognized that their expertise and equipment were essential for the enforcement of apartheid and associated abuses such as denationalization, torture, and killings. Nonetheless, Defendants purposefully acted to continue supplying specifically unlawful materials, even in the face of sanction regimes, which evinces their intent to support apartheid. Even if Defendants assert lawful business reasons for certain sales, for example maintaining good relations with the South African government to secure contracts not banned by sanctions, these reasons do not excuse the specific unlawful instances of support provided to advance violations of the law of nations. Defendants should no more escape liability for their complicity in apartheid than any other defendant would escape liability for wrongful acts committed alongside lawful ones.

*Kiobel II* and *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), mandate jurisdiction here. Defendants' purposeful U.S.-based actions not only touch and concern this forum, but there is no other forum where they can be held accountable for their roles in apartheid. Beyond mere corporate presence here, IBM and Ford, in the United States, made critical decision and provided substantial assistance for specific apartheid-era abuses. Dismissal would leave Plaintiffs with no available forum, even though the rationales of *Kiobel II* and *Bauman* instruct that international law prefers home country jurisdiction when possible. Allowing these matters to proceed here is thus mandated by the reasoning of *Kiobel II* and *Bauman*.

## ARGUMENT

**I.   This Court Should Grant Plaintiffs' Motion for Leave to Amend their Complaints**

This Court should grant Plaintiffs leave to amend because recent decisions from the Supreme Court and Second Circuit have changed the applicable legal standards. Plaintiffs' 2008 Complaints were drafted before *Kiobel II*, which applied a presumption against extraterritoriality to Alien Tort Statute ("ATS") claims but provided an exception for claims that "touch and concern" the United States with "sufficient force" to overcome the presumption. *Id.* at 1669. Similarly, Plaintiffs should be permitted to amend given *Talisman*, which established a new standard that aiding and abetting liability requires a showing that the defendant acted with purpose, rather than mere knowledge that his actions would aid and abet an international law violation. 582 F.3d at 259.

It is well settled that courts "should freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). Courts in the Second Circuit routinely grant parties leave to amend pleadings so that they may address a change in applicable law.[1]

**II.   Ford and IBM's U.S. Citizenship Satisfy the "Touch and Concern" Standard**

The effect of citizenship on the "touch and concern" analysis remains an open question in this circuit. *See Chowdhury v. Worldtel Bangladesh Holding Ltd.*, 746 F.3d 42, 57 n.4 (2d Cir. 2014) (J. Pooler, concurring) ("[*Kiobel II*] at least implied that nationality 'could be relevant' to the 'touch and concern' analysis."). The United States has a well-recognized interest in adjudicating the conduct of its citizens, even if that conduct occurs abroad. *See, e.g.*, Sir Robert Jennings & Sir Arthur Watts, eds., *Oppenheim's International Law*, § 138 at 462 (9th ed. 1992);

---

[1] *See, e.g., New York SMSA Ltd. Partnership v. Town of Hempstead*, 2013 WL 1148898, at *8 (E.D.N.Y. Mar. 19, 2013); *Park B. Smith, Inc. v. CHF Industries, Inc.*, 811 F. Supp. 2d 766, 780 (S.D.N.Y. 2011); *Smart v. Arnone*, 315 F. Supp. 2d 292, 293-95 (W.D.N.Y. 2004).

Restatement (Third) of the Foreign Relations Law of the U.S., § 402(2) (1987) ("Restatement (Third)"); *Sexual Minorities Uganda*, 960 F. Supp. 2d 304, 322 (D. Mass. 2013). This principle applies to corporations as well as natural persons. Restatement (Third), § 402 cmt. e. It is uncontroverted that Defendants are incorporated and headquartered in the United States.

**III.    Even if this Court Determines that U.S. Citizenship is Insufficient under *Kiobel II*, Both IBM and Ford Conducted Substantial Activities in the U.S. to Purposefully Assist Abuses, Which is Sufficient to Overcome the *Kiobel II* Presumption**

Even if this Court determines that U.S. citizenship is insufficient to overcome *Kiobel II's* presumption, the "touch and concern" standard is satisfied where a defendant is a U.S. citizen and where certain conduct, such as direction of alleged tortious activities, occurs in the United States. *See, e.g., Kiobel II* at 1669; *Balintulo* at 191 and n.26 (discussing conduct inside the U.S. as relevant to touch and concern analysis); *Chowdhury*, 746 F.3d at 55-59 (J. Pooler, concurring); *see also Sexual Minorities Uganda*, 960 F. Supp. 2d at 322 ("An exercise of jurisdiction under the ATS over claims against an American citizen who has allegedly violated the law of nations in large part through actions committed within this country fits comfortably within the limits described in *Kiobel*."); *Du Daobin v. Cisco Systems, Inc.*, No. PJM 11-1538, 2014 WL 769095, *9 (D. Md. Feb. 24, 2014) (discussing development of U.S.-based computer technology, and stating "ATS claims could be brought against a defendant that has taken certain actions within the United States with respect to products which might be primarily used for violations of the laws of nations."). Defendants directed and controlled South African operations through subsidiaries and agents, particularly by making critical U.S.-based decisions and providing expertise, management, technology, and equipment from the United States that were essential to the abuses.

Defendants' intentional actions in the United States are sufficient not only to overcome the *Kiobel II* presumption, but also to meet *Talisman*'s purpose standard. 582 F.3d at 259. IBM, from the United States, sought to prevent the imposition of the U.S. embargo on South Africa. When that failed, IBM assured the South African government that its work in South Africa would continue, including through provision of hardware, software, and technical support to implement denationalization through the homeland system. IBM also circumvented the U.S. embargo by directing IBM offices to continue to provide the same services. Ford decided—a decision made and implemented in the United States—to oppose efforts that would end sales to the South African security forces because doing otherwise might harm Ford's overall business interests. Vehicle sales to the military and police were not a large percentage of Ford's overall sales in South Africa but were still important to maintain relations with the government. The fact that Ford desired to facilitate other sales or maintain the viability of their operations does not negate intentional support of the South African security forces and their abuse of the South Africa population. IBM and Ford thus purposefully facilitated specific violations and should be held responsible for that support. Plaintiffs do not allege mere investment in South Africa generally but rather purposeful and intentional decisions by IBM and Ford to support specific instances of unlawful acts.

## IV. Allegations Demonstrating that the Claims against IBM Involve Purposeful Conduct and Touch and Concern the United States

If permitted to amend, Plaintiffs would plead that: IBM's complicity in implementing and perpetuating apartheid and denationalization in South Africa and the Bantustans, including Bophuthatswana, was directed from the United States; machinery and technology, as well as essential technical support, came from the United States for these purposes; IBM was intent on supplying hardware and software to South Africa, including to support denationalization, as

5

demonstrated by IBM first trying to prevent U.S. sanction on the apartheid regime and later

trying to circumvent the U.S. embargo; IBM's support for apartheid contradicted U.S. foreign

policy at the time; and IBM's effort to portray its equipment as dual-use was misleading, as the

company supplied hardware and software with the intent to violate international law and for the

purpose of denationalizing black South Africans.[2]

## A.   IBM's Policies Regarding South Africa and its Operations Were Directed from the United States

IBM is and was a centralized corporation,[3] directed from U.S. headquarters.[4]  Its Board of

Directors, which meets in the United States, is responsible for supervising the company's overall

affairs.   At all relevant times, the code of business conduct, standards, and values for IBM

directors, executive officers, and employees globally were set by IBM in the United States.  IBM

headquarters provided personnel policies for employees throughout the company, including in

South Africa.[5]   Adoption of the Sullivan Principles is a specific example of how IBM's U.S.

headquarters controlled and directed its South African policy.[6]  The fact that IBM did not have

research and development or manufacturing facilities in South Africa is further evidence of the

---

[2] Sources of information in this memorandum of law are based on public sources, which are cited, or interviews, which are not cited just as they would not be in a complaint.
[3] *See* Thomas W. Malone, *Making the Decision to Decentralize*, WORKING KNOWLEDGE (Mar. 29, 2004), available at http://hbswk.hbs.edu/archive/4020.html#1 (citing Louis V. Gerstner Jr., *Who Says Elephants Can't Dance? Inside IBM's Historic Turnaround* (New York: HarperBusiness, 2002), 12-13, 57-62, 68-70).
[4] Implicit in IBM's public claim that it applied the Sullivan Principles in South Africa is that it could direct the personnel and policies of its operations there.  Ranjay Gulati, REORGANIZE FOR RESILIENCE. (Harvard Business School Publishing Corporation, 2009).  *See also* IBM Highlights, 1885-1969, available at http://www-03.ibm.com/ibm/history/documents/pdf/1885-1969.pdf.
[5] IBM Highlights, 1885-1969 (discussing expansion of nondiscrimination policy in 1961).
[6] As of 1979 both IBM and IBM South Africa had signed the Sullivan Principles.  Elizabeth Schmidt, DECODING CORPORATE CAMOUFLAGE, 61 (Institute for Policy Studies, 1980) Appendix I "Signatories to the Sullivan Principles".

U.S. direction and control of South African operations.[7]

For a significant time period, IBM controlled nearly half the South African computer industry.[8] IBM's export from the United States to South Africa of equipment, expertise, and training on how to use and maintain its technology was essential to apartheid.[9] Between 1960 and 1980, South Africa had no indigenous domestic computer industry and was entirely dependent on outside sources for all computerized operations.[10] "South Africa really needs U.S. companies in certain industries, particularly high tech industries and computers," IBM's representative told investigators from the House Subcommittee on Africa in 1984.[11] A "lack of access to foreign technology could cripple South Africa, as [U.S. government] cable point[ed] out. The incapacitation of a single computer would necessitate 'having to find hundreds of

---

[7] Judy Claude, *Computing Apartheid: The Role of U.S. Customer Companies in South* Africa, (June 1978), available at http://kora.matrix.msu.edu/files/50/304/32-130-1368-84-cic%206-78%20opt.pdf. The United States was the focus of IBM's research and development efforts. On its federal tax return, IBM treated so much of its research and development expenses as U.S.-related that it reported almost no U.S. earnings—despite $25 billion in U.S. sales that year. As a result, IBM's federal income taxes for 1987 were virtually non-existent. *See The Hidden Entitlements*, CTJ, available at http://www.ctj.org/hid_ent/part-2/part2-3.htm. The lack of taxes contrasted with its 1987 annual report to its stockholders, in which IBM said that a third of its worldwide profits were earned by its U.S. operations. Thus, IBM's subsidiaries were used by IBM in the U.S. to avoid taxes and other national laws. These facts support the inference that: (1) IBM subsidiaries were directed from the United States; and (2) the development and research for IBM's products used in South Africa occurred in the United States.

[8] Paul N. Edwards & Gabrielle Hecht, *History and the Technopolitics of Identity: The Case of Apartheid South Africa*, 36 J. S. AFR. STUD. 630 (2010).

[9] NARMIC/AMERICAN FRIENDS SERVICE COMMITTEE, AUTOMATING APARTHEID: U.S. COMPUTER EXPORTS TO SOUTH AFRICA AND THE ARMS EMBARGO, 10-12 (1982) ("*Automating Apartheid*"). Even if some sales did not technically violate the embargo, some sales specifically were designed to denationalize and help enforce apartheid.

[10] Lawrence Litvak et al., SOUTH AFRICA: FOREIGN INVESTMENT AND APARTHEID, 50 (Institute for Policy Studies 1978), *see also* Edwards and Hecht, at 619, 630-31 (2010) ("In 1975, Management magazine surveyed the entire computer inventory of S.A., tallying 1,119 machines and guessing the true total at about 1,500.").

[11] Richard Knight, *U.S. Computers in South Africa*, The Africa Fund, 1986, available at http://richardknight.homestead.com/files/uscomputers.htm.

bookkeepers who are not available on [the] labor market.'"[12]  As of 1986, South Africa relied on

imported mainframe computers.[13]  As a computer industry official in South Africa explained:

"We're entirely dependent on the United States.  The economy would grind to a halt without

access to the computer technology of the West."[14]

This dependency on foreign technology companies made IBM's U.S.-based decisions

about its South African policy all the more important.[15]  In the United States, IBM opposed

shareholder resolutions related to divestment[16] and advocated for a sanctions regime that would

allow it to support the South African government's implementation and enforcement of

apartheid, thereby interfering with U.S. foreign policy.[17]  IBM decided to maintain maximum

---

[12] *Automating Apartheid* at 9.

[13] Some personal computers were assembled locally, the parts were imported.  *See* Knight, *U.S. Computers in South Africa.*

[14] Interview with C. Cotton, Managing Director, Burroughs South Africa, in Johannesburg, South Africa (Mar. 3, 1971), at 3.

[15] Edwards and Hecht at 630-31 (noting also that monitoring such U.S. exports and restrictions could be done with relative ease).

[16] Edwards and Hecht at 630-31 ("From 1972 on, activist minority shareholders introduced disinvestment resolutions at every annual IBM stockholder meeting.").  For example, in 1975, church-related stockholders asked IBM to stop selling computers to South Africa, contending that the computers helped the government implement the pass system.  Kevin Danaher, IN WHOSE INTEREST? A GUIDE TO U.S.-SOUTH AFRICA RELATIONS 116 (1984).
     At its 1987 annual meeting—the year that IBM "divested" from South Africa, *see infra* Part IV.C, IBM also overwhelming voted down a resolution sponsored by anti-apartheid activists that would have banned the sale of IBM products.  *See* John Pickles and Jeff Woods, "Undermining Disinvestment: From a Marginal Propensity to Invest to a Propensity to Invest in the Margins," Africa Today, Vol. 37, No. 2, *Dismantling Apartheid: Problems and Possibilities* (2nd Qtr., 1990), at 72.

[17] In November, 1977 following the passage of a mandatory arms embargo resolution by the UN Security Council, the Carter administration announced new curbs affecting computer sales to South Africa, that prohibited, in furtherance of the administration's policies "supporting human rights," the sale, direct or indirect,  of *any* U.S. commodities or technical data to military or police entities in South Africa.  *See* Knight, *U.S. Computers in South Africa.*  During the early years of the Reagan administration, the sanctions were loosened.  *See Automating Apartheid* at 61-62.  When the Export Administration Act became law in July 1985, it contained a clause that enacted the controls that had been in effect under President Reagan also issued an executive order in September 1985 banning computer sales to the military, police, prison system and

flexibility for continued sales to the apartheid government despite that fact that its operations supported unlawful behavior that the U.S. government sought to prevent.[18] For example, after the adoption of the 1978 regulations that would have curbed sales to South Africa, IBM pushed for a system that lacked enforcement and interpreted flexibility in the sanctions regime.[19] IBM opposed the 1978 sanctions: "Senior U.S. officials from the home offices of IBM . . . and other multinationals registered their opposition to the ban and asked that it be lifted."[20] IBM sought to help the apartheid structures "adjust to the threat posed by trade sanctions" and elude the goals of the embargo, for example by making plans to switch to non-U.S. supply stocks and pledging to help the South African government overcome shortages of strategic goods by deceptive means.[21] The practical effort of the opposition to restrictions was that U.S. corporations—like IBM—were "setting the actual operating parameters of the embargo."[22] This "left enough of South Africa's supply conduits intact so as to insure that the Pretoria regime will have continued access to computers, communications gear, electronics and security equipment."[23]

---

national security agencies. In 1986, Congress passed the Comprehensive Anti-Apartheid Act, prohibited the export of computers, software, and other technology for the use of South Africa government entities associated with apartheid and the extension of new loans or credit to such entities. *See* Pub. L. No. 99-440, 100 Stat. 1086, §§ 301-23 (1986).

[18] *Automating Apartheid* at 7-8 (discussing lack of direct presence but continuous and conscious effort to pursue sales in South Africa); *id.* at 9-12 (discussing concerted effort to oppose 1978 sanctions so as to allow sales to South African military and police).

[19] *Id.* at 62.

[20] *Id.* at 9-10; *id.* at 10 (new regulations allowed computer sales that did not "contribute significantly to security operations"); *id.* (U.S. components could be sold to "security forces from foreign countries" if "they are incorporated in a larger system and make up no more than twenty percent of it"); *id.* (re-export and re-sale of "insubstantial portions" of goods also allowed "if the commodities would not play a major role in security operations"); *id.* (computer and similar products generally "considered favorably for export unless they would be used to enforce apartheid.").

[21] *Id.* at 71.

[22] *Id.*

[23] *Id.* at 62.

IBM repeatedly misled the U.S. government and its own shareholders about the true nature of its activities in South Africa to circumvent domestic criticism. Chairman Frank Cary noted at IBM's 1977 annual meeting: "I have said time and again that we have investigated each instance brought to our attention where there was any reason to believe IBM computers might be used for repressive purposes, and we have found no such use."[24] However, at the same meeting, IBM confirmed that its machines stored the data of colored, Asian, and white South Africans.[25] On another occasion, IBM stated that it would continue to service computers in the South African Department of Defense.[26] Jack Clark, head of IBM South Africa, said that it would do so by using parts already in South Africa.[27] IBM was therefore able to continue to support apartheid while giving the appearance of compliance with the embargo.

IBM made many arguments defending its support of apartheid. IBM asserted that South African government agencies used IBM computers only for "administration" and not for repressive use.[28] This claim ignored the nature both of the government and the tasks it performed, such as denationalization of an entire ethnic group. In 1985, Chairman Akers explained: "If we elect to leave it will be a business decision. What other kind of decision would it be? We are not in business to conduct moral activity, we are not in business to conduct

---

[24] Richard Leonard, *Computers in South Africa: A Survey of U.S. Companies,* at 4.

[25] *Id.*

[26] E. Drake Lundell, Jr., *Churches Hit IBM Inaction on Rights in South Africa,* COMPUTERWORLD, May 29, 1978; *see also* Richard Leonard, *IBM Update: Still Computing Apartheid,* 16 ICCR Brief 3A (1987), available at http://kora.matrix.msu.edu/files/50/304/32-130-1363-84-cic%20No5-87%20opt.pdf (quoting Jack F. Clark, former manager of IBM South Africa, as stating "There will be no change in the supply of IBM products.").

[27] *Id.*

[28] Barnaby J. Feder, "IBM Is Shedding South Africa Unit; Pressure Is Cited," The New York Times, Oct. 22, 1986.

socially responsible action. We are in business to conduct business."[29]  Assuming the decision to

aid and abet the implementation of apartheid was a "business" decision, however, IBM intended

the specific results that were violations of international law when it entered into contracts for the

purpose of physically separating the races through the pass system and the homeland system.

IBM also asserted that its equipment was not essential or significant and that legitimate

purposes overshadowed any risk of harm, even while IBM acknowledged that its equipment

facilitated racial separation and denationalization.[30]  In fact, IBM was determined to circumvent

the sanctions regime and made plans to camouflage its operations through deceptions arranged

with affiliates in other countries.[31]  IBM acknowledged that it intended to use overseas

subsidiaries to supply the South African government and that it supplied non-U.S.-made parts to

some embargoed South African agencies that were not permitted to receive U.S. equipment.

*Computer Weekly* reported IBM's statement that it would continue to supply spare parts and

service to any affected South African military or police computers as long as supplies lasted.[32]

IBM justified these transactions by arguing that U.S. regulations did not restrict them.[33]  Even

---

[29] David Sanger, "South African Prospects Leave I.B.M. Chief Glum," New York Times, April 1986.

[30] *Automating Apartheid* at 15 ("When questioned about IBM's role in the expansion of [the pass] system, an IBM official replied, 'We feel that the fact that it is being done with computers hasn't any appreciable overall effects on the apartheid situation. This pass system could be done in many other ways besides computers.'"). *Id.* at 45 (discussing Infoplan, and IBM sales to it, which IBM maintained were legal and did not support military projects). *Id.* at 52-55 (discussing IBM's deep connections with the military-industrial complex in South Africa, including "top explosives manufacturers"). *Id.* at 66 (discussing IBM training facility in Johannesburg, which includes training for Infoplan and CSIR (which is part of the military-industrial complex). Since much of computer technology is about know-how, this efforts supports apartheid as much as equipment sales.

[31] *Id.* at 9, 63-65.

[32] Computer Weekly, United Kingdom, March 31, 1978.

[33] *Automating Apartheid* at 65 ("Another cable from the U.S. mission in Pretoria to the State Department, which was released under the Freedom of Information Act, made clear that the South African government is fully aware of the fact that U.S. multinationals are using this

after divestment, IBM ensured that its West German subsidiary and the Japanese company Hitachi could supply parts to service embargoed IBM equipment.[34]

In an advertisement in a software catalog published in South Africa in 1980, IBM's General Systems Division marketed a "Law Enforcement System." In response to inquiries about the package, an IBM spokesperson did not deny that the police system was available in South Africa but said that it marketed this product via "direct proposals" as opposed to "passive" advertising in publications.[35] This admission caused a scandal and IBM subsequently denied placing the ad or selling the software.[36] Only after the existence of the package was publicly disclosed did IBM begin to insist that it was not available in South Africa. The company was unwilling or unable to say how the law enforcement software appeared in the South African computer publication.[37]

In a 1982 letter to the State Department, IBM admitted its machines were used for the national identity system maintained by South Africa's Interior Department. This system was the

---

loophole to circumvent the goal of the arms embargo: 'It is our understanding that most U.S. firms have been able to continue sales by shifting to non-U.S. sources for components,' cabled an official to the State Department.").

[34] Rita Arditti, et al., SCIENCE AND LIBERATION 204 (1980), available at http://books.google.com/books?id=rE4SnULjDgQC&pg=PA204&lpg=PA204&dq=ibm+west+g erman+subsidiary+hitachi+south+africa+embargo&source=bl&ots=V1YBG79BUc&sig=8sY5u mobUsRtMd9CGAaa31Dt-NY&hl=en&sa=X&ei=DMeIU_qmDeHEsATRx4C4Dw&ved=0CCgQ6AEwAA#v=onepage&q =ibm%20west%20german%20subsidiary%20hitachi%20south%20africa%20embargo&f=false.

[35] *Automating Apartheid*, at 9-10 (providing citations to cables). Victor R. Macdonald, IBM vice president, omitted this key fact from his letter. IBM originally leased this system to the Interior Department. The South African government may have subsequently purchased it outright, but it would still have needed spare parts from IBM.

[36] *Testimony from the American Friends Service Committee Concerning U.S. Controls on Exports to South Africa: Hearing Before the Subcomm. on Afr. and the Subcomm. On Int'l Econ. Policy & Trade of the H. Comm. on Foreign Affairs*, 97th Cong. (1982) (statement of Thomas Conrad, Staff Researcher, American Friends Service Committee), available at http://kora.matrix.msu.edu/files/50/304/32-130-1A83-84-AFSC_SA_Testimony_feb9_1982_opt.pdf.

[37] *Id.*

basis for the "Book of Life" which, along with the passbook, facilitated the racial classifications that made apartheid possible.[38]

In 1987, Akers said that IBM had sold its assets in South Africa and that IBM's South Africa representative no longer sold directly to the police or military.[39]   Implicit in Akers' assertion is that, even after IBM's sale of assets to a newly created company, that company still followed U.S.-directed policies.  This interpretation is consistent with the statement of the former head of IBM South Africa, who became head of the newly formed company:

> The former manager of IBM South Africa, Jack F. Clarke will be managing director of the new independent company.  In full page advertisements in major South African papers, Clarke has gone out of his way to reassure IBM's South African customers that they will still be able to buy IBM computers and other products.  "The new company will hold the sole franchise for IBM in South Africa, and has a supply and service contract with IBM. . . . There will be no change in the supply of IBM products," he wrote in a personally signed letter.  Annual sales are estimated at over $200 million, the largest by far of any computer company in South Africa.  IBM computers will continue to dominate the South African market.[40]

Years of IBM's actions make evident that IBM pursued business in a manner directly contrary to the intent of the U.S. embargo and sanctions regime, and IBM's own public statements indicate that decisions about its South African operations, including business with institutions involved in implementing apartheid and denationalization, were made in the United States.

**B.    IBM Purposefully Provided Substantial Assistance to the Functioning and Maintenance of the Apartheid System**

IBM provided computer technology, systems, software, hardware, training, and support

---

[38] *See* Thomas Conrad, Letter to the Editor, *Machines that Help Make Apartheid Run*, N.Y. TIMES, May 18, 1985, available at http://www.nytimes.com/1985/05/18/opinion/l-machines-that-help-make-apartheid-run-249678.html.

[39] William Howard, *South Africa Resolution is Defeated*, PALM BEACH POST, Apr. 26, 1988, at 6B, available at
http://news.google.com/newspapers?nid=1964&dat=19880426&id=4iMjAAAAIBAJ&sjid=js4F AAAAIBAJ&pg=2658,4149529.

[40] Knight, *U.S. Computers in South Africa*.

to facilitate the apartheid government's control and repression of the black population.  IBM purposefully sought contracts that would achieve these ends and then executed those contracts in order to maintain its business in South Africa as well as to accomplish the goals of apartheid. IBM claimed that it would not knowingly sell equipment to customers who would use it to further repression, but, in fact, IBM purposely pursued contracts that supported the implementation of apartheid, including the "Book of Life" and the Bantustan identity documents. In order to be most effective, the creation and maintenance of the South African system of population control organized by racial classification, which was essential to apartheid, required sophisticated computer technology provided by IBM.

The Bantustans represented the ultimate goal of apartheid: the creation of a white majority South Africa through denationalization of the black majority, who were forced to become citizens of "independent" homelands (Bantustans) comprising 13% of the undesirable rural land that had been a part of South Africa.  The administrations of at least one Bantustan—Bophuthatswana—relied on IBM System 3/10 computers.[41]

Bophuthatswana was accorded nominal independence, as a putatively sovereign state, in 1977, and established some indicia of statehood, including the capacity to have "citizens".  This status was forced upon black South Africans of Tswana descent as part of the exercise of denationalization that was both the foundation and goal of Grand Apartheid—the permanent physical separation of the races.  The Bophuthatswana government imposed identity documents and passports on those who were denationalized.

For this purpose, the Bophuthatswana government used IBM computers and systems, including both hardware and software.  Bophuthatswana government employees working with

---

[41] *Id.* (also discussing use of same computer in Gazankulu, though that Bantustan never attained full "independence.").

14

IBM computers and systems were trained in an IBM-specific programming language. IBM ran training courses for government employees in Johannesburg and Bophuthatswana. The courses also covered the proper use and maintenance of IBM machines. Programmers who attended these courses were government employees. Some computer programs run by the Bophuthatswana government on IBM machines were developed and written in-house with the assistance of IBM employees. When government employees encountered difficulty with their machines or programs, IBM employees assisted in troubleshooting and repairing problems.

By 1978, IBM actively participated in creating a new identity book for the Bophuthatswana government by developing a sub-system to produce the identity book. IBM developed both the hardware and software, used to create the Bophuthatswana identity document. Once IBM had developed the system, it was transferred to the Bophuthatswana government for implementation. IBM employees trained Bophuthatswana government employees to use the IBM machine and program to produce identity documents. IBM was contacted when problems arose with the identity book system and IBM employees would fix problems.

The identity documents produced for the Bophuthatswana government contained the name, sex, racial classification, ethnic origin, and residential and/or postal address of the individual. Bophuthatswana residents were required to carry the Bophuthatswana identity documents produced by the Bophuthatswana government with the active and intentional participation of IBM. In addition to effecting denationalization, the Bantustan system that IBM helped to established resulted in other violations against black South Africans, including deprivation of property, education, and employment, division of families, restrictions on travel, and restrictions on political activities. Other homeland governments, including but not limited to

Gazankulu, KwaZulu, Lebowa, Transkei, Ciskei, and Venda also used IBM hardware and software to produce identity documents.

Beyond its support for the homelands, IBM supplied the South African government and provided essential support for the "Book of Life". Although IBM was outbid for the contract to provide technology to produce the African passbook in 1965,[42] IBM hardware served as the electronic memory bank for a large part of South Africa's national identity system. Pretoria's Interior Department ran its population registry, the so-called "Book of Life", on two IBM mainframes that stored details on seven million citizens the government classifies as "coloureds," Asians, and whites.[43] The Book of Life contained assorted information, including racial classification, name, sex, date of birth, residence, photograph, marital status, driver license number, dates of travel/exit from and/or return to the country, place of work or study, and finger prints. The Book of Life enabled authorities to identify individuals as coloured, Asian, Indian, or other, to determine their rights in accordance with their movement, employment, and other status, and also had to be carried at all times.[44] The Group Areas Act, which controlled the movements of coloureds and Asians and allowed the government to suppress them, could not have been enforced without the Book of Life.[45]

IBM officials in the United States maintained that the Interior Department installation for the Book of Life was not objectionable because it did not cover the black population; this

---

[42] Litvak at 52.

[43] At least one-third of IBM's business was with the government, including the use of an IBM computer by the Department of Prisons and two IBM systems used in the population registration system known as the Book of Life. The newsletter quotes IBM Chairman Frank Cary. IBM Workers United, *IBM: Speak Up! The Truth about the Company in South Africa* (Johnson City, New York, 1979), available at http://africanactivist.msu.edu/document_metadata.php?objectid=32-130-14BA.

[44] Litvak at 52.

[45] Litvak at 52 (citing n.80).

assertion was intended to obscure the fact that IBM's hardware played a key role in facilitating the very system of racial classification that made apartheid possible.[46]   Moreover, the implication is clear that the origin of the machinery was the United States.

### C.   IBM's "Divestment" from South Africa

Although IBM formally withdrew from South Africa in 1987, it intentionally continued its support for apartheid and denationalization.  In 1986, IBM announced its intention to sell its South African holdings, although it would continue to license and distribute its products in the country.  IBM said that it would sell its subsidiary, which it operated for 34 years, in 1987 for an undisclosed price to a new company established "for the benefit of the employees of IBM South Africa."[47]   Company spokespersons said this was done so that the newly independent company could fulfill IBM South Africa's existing contractual responsibilities.

While IBM itself would no longer have assets, capital, or employees in South Africa, the new company signed multi-year contracts to import and sell IBM products, services, and technologies.[48]   The same IBM employee Jack Clarke, who headed IBM South Africa, headed the new company.[49]   As one IBM dealer explained at the time, "Nothing has really changed except that IBM no longer has to account for its presence in South Africa."[50]   These arrangements at the least violated the spirit of U.S government restrictions, since parts would be

---

[46] Litvak at 52.
[47] South Africa History Online, *The Company, IBM, re-forms in South Africa*, (Oct. 21, 1986), available at http://www.sahistory.org.za/dated-event/company-ibm-re-forms-south-africa.
[48] IBM also would profit from interest on loans it made to the South African buyers of the subsidiary. *Id.*
[49] Wall Street Journal, August 24, 1987.
[50] ICCR Brief Vol. 16 No. 5p. 3A 1987.  "According to a management letter leaked to *The Financial Times*, IBM operations would continue as normal through the creation of a locally-owned company to handle IBM's business; the letter also claimed: '[T]he new company will be able to respond with greater flexibility than a wholly-owned IBM subsidiary.  In the current international climate such flexibility will clearly be to our customer's advantage.'"  Pickles and Woods, at 72.

made under IBM patents registered in the United States.  It is clear that IBM intended—as it had for years—to service South African agencies, contrary to the intent of U.S. regulations.

## V.  Allegations Demonstrating that the Claims Against Ford Involve Purposeful Conduct and Touch and Concern the United States

If permitted to amend, Plaintiffs would plead that: Ford's complicity in implementing and perpetuating apartheid in South Africa was directed from the United States; management, machinery, and technology came from the United States for the purpose of supporting the apartheid security apparatus in its repression of black South Africans and anti-apartheid activities; Ford's conduct contradicted U.S. foreign policy at the time; and Ford intentionally sought to circumvent U.S. law.

### A.  Ford's Actions in South Africa Were Directed from the United States

The Ford Motor Company ("Ford") and is an American multinational automaker based in Dearborn, Michigan, near Detroit, whose Michigan headquarters at all relevant times has directed the operations of its subsidiaries globally; it includes a global automotive group with a single president, who was also an executive vice-president from the headquarters.[51]  At all relevant times, Ford vehicles and components were developed and produce wherever it was best equipped to do so.[52]

Ford controlled its South African operations through Ford Motor Company of South Africa (Pty) Ltd. ("Ford South Africa"), which was formed in 1933.  It was a wholly-owned subsidiary of Ford Motor Company of Canada, Ltd. ("Ford Canada"), which was itself 76% owned by Ford.  In 1985, Ford merged a subsidiary of Ford Canada with Amcar Motor Holdings, a unit of the Anglo American Corporation, to form the South African Motor Corporation

---

[51] *See, e.g.*, 1987 Annual Report, at 5, 8.
[52] *Id.* at 8.

18

(SAMCOR). After the merger, Ford had a 42% stake in SAMCOR, with the rest held by Anglo American.[53] In November 1987, Ford announced that it would dispose of its share in SAMCOR by selling it to Anglo American and creating a trust for SAMCOR employees.[54] Although Ford was formally divested of its stake in SAMCOR, Ford allowed SAMCOR to continue "to use its trade name and . . . provide[d] parts, vehicles and management assistance."[55] Ford transferred tens of millions from the payment it received from the sale directly to SAMCOR. Ford became the major shareholder again in 2000 and then renamed SAMCOR, Ford of South Africa.[56]

Foreign companies, including Ford, historically dominated the auto industry in South Africa, and by the late 1970s, of the ten auto companies in South Africa, only one was South African owned.[57] In 1978, Ford's sales in South Africa were estimated at $288 million and its investments were valued at $119 million.[58] At that time, with the auto industry in a downturn and the South Africa government seeking to minimize companies in the industry to ones that could be more stable and profitable, "GM and Ford [were] two of the best-capitalized car manufacturers, possessing the resources to sit out a transition and emerge strong."[59]

---

[53] John Battersby, *South Africa Sale by Ford Will Give Blacks Big* Stake, N.Y. Times, June 15, 1987.
[54] *Id.*
[55] *Ford to dispose of its stake in South Africa's Samcor*, The Wall Street Journal Europe, Nov. 25, 1987 WSJ (emphasis added).
[56] Deon Sonnekus, *Samcor becomes Ford of Southern Africa*, News24, Aug. 21, 2000, available at: http://www.news24.com/xArchive/Archive/Samcor-becomes-Ford-of-Southern-Africa-20000821.
[57] Kenneth Propp and Desaix Myers III, "The Motor Industry in South Africa," South Africa Review Service: Industry Sector Report (February 1979) by the Investor Responsibility Research Center (IRRC), at 2-4, 6. Ford built the first assembly plant in the country in 1923 and was the market leader in 1977 and second in 1978. *Id.* at 7. In 1978, Ford's sales in South Africa were estimated at $288 million and its investments were valued at $119 million. *Id.*
[58] *Id.*
[59] *Id.* at 10.

During all relevant times, key decisions about investments, policy, and operations in South Africa were made by Ford in the United States. Much of the motivation for Ford's actions in South Africa was the long-term potential for profit on its substantial existing investment, with a desire to "await the development of the black market" and not be "excluded from its enormous potential, nor from the equally great—and equally undeveloped—potential for export to other black African nations."[60] Thus, despite the tightening of U.S. trade sanctions in February 1978, Ford still announced a "large infusion[] of capital into its South African subsidiary. Ford injected \$8 million for upkeep and retooling."[61] Ford and other U.S. automakers made policy, management, investment, sales, and operational decisions that purposefully supported the apartheid government, including with sales to the security forces and police, in order to preserve future relationships with the government.[62] In fact, automakers like Ford were specifically concerned about not losing control to South African nationals.[63] Ford sought to comply only

---

[60] *Id.* at 10.

[61] *Id.* at 20 (noting also that "company has been constrained to inject foreign capital into operations that now do not return much on their already large assets.").

[62] *Id.* at 18 ("Disclosures by GM and Ford about the volume of their sales to the police and military indicate that even if these sales [to the defense and police] do not represent a large proportion of the companies' aggregate sales, both the automakers and the government consider them important. Obviously, motor vehicles and tires are central to the maintenance of a prepared defense and police establishment. GM especially has been anxious to preserve its supplier relationship with the government, as have the major tire manufacturers, despite current restrictions on such sales imposed by the U.S. government. The companies appear to believe that the government's perception of whether they are willing to cooperate in car and truck sales outweighs the actual volume of sales.").

[63] *Id.* at 14 (discussing "two GM memoranda describing a 'contingency plan' for continuing production 'in the event of serious civil unrest'" that reflected multinational industry sentiment, and according to one memo, "GM's white employees have been 'encouraged by the authorities to volunteer to join a local commando unit. . . . The GM commando would assume guarding responsibility for the GM plants and would fall under the control of the local military authority for the duration of the emergency. . . .' Jennifer Davis of the American Committee of Africa argues that the documents show that GM's managers in South Africa 'see the interests of the company as identical to those of the South African government. . . .' The government, she says,

with the technical letter of U.S. regulations but purposefully shifted supply chains outside the United States to circumvent their intent and deliberately support the apartheid government.[64]   As the acting director of Southern African Affairs at the State Department noted in 1978, when offering his opinion about auto company sales in South Africa:  "Such sales have the effect of lessening the impact of what U.S. policy seeks to accomplish—keeping essential goods and services from the South African military and police.   While not a violation of U.S. law, such sales run counter to the policy objectives of the United States."[65]

Both Ford South Africa and SAMCOR continued the business activities of Ford and were directed by Ford in Michigan.[66]   Ford adopted the Sullivan Principles, for example, regarding operations in South Africa.[67]   Ford regularly sent U.S. delegations to South African facilities and provided experts for work on new installations there.   Ford also sent employees to deal with Human Resource issues and to establish HR programs such as "Zero Defects."   Management personnel were transferred from one part of Ford to another.   For example, the general manger of Ford South Africa was appointed and sent from Ford in Detroit and went on to other jobs in Ford

---

'has well-laid plans to use the companies to protect its system of white supremacy, and these documents make it clear that GM intends to fully comply.'").

[64] *Id.* at 13.

[65] *Id.* at 13.

[66] Ford Motor Co. (1989) Form 10-K 1989 (stating Ford operates in South Africa though SAMCOR).

[67] "The Motor Industry in South Africa," at 14.   Ford executives also implicitly acknowledged direction from the headquarters for its activities in South Africa.   In a July 1979 meeting with a religious taskforce, Ford officials, including William Broderick, the Vice President for international and government affairs for Ford in the United States, explained the company's actions in South Africa.   Ford officials said that the loss of police and military contracts would lead to layoffs and potentially a consumer boycott of Ford.   Broderick further stated that UN Security Council Resolutions did not prohibit the sale of non-military vehicles or equipment.   *See* Renate Pratt, IN GOOD FAITH: CANADIAN CHURCHES AGAINST APARTHEID 43 (Canadian Corporation for Studies in Religion, 1997), available at http://books.google.com/books?id=KlI0T9N7NzcC&pg=PA42&lpg=PA42&dq=ford+apartheid &source=bl&ots=ZTidIy_iZV&sig=S9I1B0YFO6csH5tZ8GUXSoVXIl4&hl=en&sa=X&ei=inN _U5XhLs6osASGtICgAQ&ved=0CC0Q6AEwAThu#v=onepage&q=ford%20apartheid&f=false

outside South Africa.  Similarly, Lewis Booth, the general manager of SAMCOR, started in 1978 with Ford of Europe, went to Dearborn, Michigan from 1993 to 1996, then to SAMCOR, and subsequently became president of Asia Pacific and Africa Operations for Ford as of January 1, 2000.[68]

Ford acknowledged that it was able to and did impose policies on its operations globally. In addition to claims about its implementation of the Sullivan Policies of non-discrimination, Ford controlled its major global policies, including it employment policies, ethical business policies and code of conduct.[69]  Ford's involvement in specific South African employee matters demonstrates its involvement from the United States.  Plaintiff Thozamile Botha, a former SAMCOR employee, was banned in South Africa.[70]  While in exile, a Ford lawyer who liaised with Ford South Africa took Botha to Ford Headquarters in Michigan.  She was a lawyer representing Ford and interviewed Botha over two days.  She showed him a letter from Ford South Africa to Ford headquarters referring to Botha, which read, "[v]ery intelligent, hard working, if he could be on our side."  The author of the letter was the Head of Personnel/Human Resources in South Africa, Fred Ferreira, who was also a member of the Broederbond.  Although she only showed Botha one letter, Ford had a file on him in the United States that included other documents.  The files and communications kept in the Michigan headquarters about Plaintiff

---

[68] Biography of Lewis Booth, Ford Motor Co., U.S. Dept. of State, available at http://2001-2009.state.gov/e/eeb/ace/2001/80311.htm.

[69] Ford Motor Co. (1989) Annual Report 1986, at Unnumbered "Centers of Excellence", 10, 20, 41; Ford Motor Co. (2012) Sustainability Report: Environmental Management 2012, available at http://corporate.ford.com/microsites/sustainability-report-2011-12/blueprint-governance-management-environmental; Ford Motor Co. (2012) Sustainability Report: Ethical Business Practices 2012, available at http://corporate.ford.com/microsites/sustainability-report-2011-12/blueprint-governance-sustainability-ethical. *See also* Penske Corp., *Case Study: Ford Motor Company* (2010), available at http://www.penskelogistics.com/pdfs/01_ford_case_study_updated.pdf (describing Ford's structure).

[70] *See* Pratt, IN GOOD FAITH CANADIAN CHURCHES AGAINST APARTHEID.

Botha reveal that Ford monitored specific employees inside the plant, which indicates a tight level of control over the operations in South Africa.

**B.  Ford's Involvement in South Africa Purposefully Provided Substantial Assistance to the Functioning and Maintenance of the Apartheid System**

Ford understood that its role in South Africa was essential to the continued operations of Ford South Africa and its successors.  Ford specifically supported the military and police, which one U.S. official noted in discussing the purposes of the embargo were, "the instruments most directly concerned with the enforcement of apartheid."[71]  Ford support was significant: "[B]etween 1973 and 1977 [Ford] sold 128 cars and 683 trucks directly to the South African Ministry of Defense and 646 cars and 1,473 trucks to the South African police."[72]  Ford explicitly acknowledged that its support for the South African police and military was essential to Ford's broader business interests in South Africa.[73]  Ford continued to supply "parts to the military and policy despite the 1978 Commerce Department regulations that prohibit the sale of any American commodity to the South African police or military."[74]

The 1978 sanctions regime was created to eliminate "gray areas" and ensure that American supplies were not flowing to vehicles used by, or increasing the "operational capacity of," the South African security forces.[75]  Although Ford may have technically compiled with the

---

[71] "The Motor Industry of South Africa," at 19. *See also id* at 6 (noting that *the Financial Mail* arms and armaments were not only goods of importance to South African Department of Defence as "motor vehicles . . . are among the strategic materials produced by foreign-controlled firms."). *See also id.* at 18.

[72] *Id.* at 4.

[73] *Id.* at 18.

[74] Elizabeth Schmidt, *Decoding Corporate Camouflage*, at 61.

[75] "The Motor Industry in South Africa," at 12 ("At the same time, the administration has sought to ensure, in the words of one official, that 'the United States should act in no way to increase the operational capacity of the South African military and police.' Responding to South Africa's arrests and bannings in October 1977, the Commerce Department on Feb. 16, 1978, issued its regulations designed to curb sales of products and technology to the South African policy and

regulations by using its facilities outside the United States to send parts to South Africa, it continued to purposefully supply the South African military and police in contravention of the intent of U.S. policy and regulations.[76] From its own statements, Ford ultimately controlled the South African plant from the United States, including supply chain policy and sales to South African forces.[77] Ford intended to continue this supply and support to maintain relations and business, even if that meant purposefully facilitating oppression.

Ford's purposeful support for the apartheid regime was clear from its specialization of vehicles for the South African police.[78] Notably, into the 1980s, Ford sold vehicles that did not need to be "converted" by the apartheid government for military or police use but were already specialized before leaving the plant in South Africa. Tags on cars being produced on the line in South Africa would indicate which cars were intended for the South African police or government. The engines in some of these models were more powerful than in other cars, and they were only made for the police or the government. In particular, Ford built a limited number of XR6 model Cortinas known as "interceptors" that were sold almost exclusively to the police. The XR6 was special because it had three Weber model double carburetors, as opposed to all other Cortinas that had only one double carburetor. Boxes of parts including nuts, bolts, and carburetors to be used in the specialized vehicles would arrive from overseas, mainly from Ford,

---

military. . . . The intent of the 1978 restrictions is to tighten up 'grey area' sales to South Africa. 'Grey area' items encompass materials of a non-military nature that could be converted on short notice to military or police use such as light airplanes, specialized computer systems, certain electronic components and strategic spare parts.").

[76] *Id.* at 15 ("Ford says that Commerce regulations have 'resulted in some loss of sales of U.S.-origin trucks to certain agencies of the South African government. The numbers involved were small.' The over-all effect of the regulations on truck sales, Ford reports, has been 'marginal.'")

[77] *Id.* at 15.

[78] Complaint, *Ntsebeza v. Citigroup, Inc.,* 02-cv-04712-SAS (Oct. 27, 2008), at ¶104.

and receive expedited treatment to get them to the plant.[79]

Ford also worked in deliberate cooperation with security forces to repress anti-apartheid and union activists.[80]   South African police and military regularly visited and entered the plants.[81]   Employees in the South African plants were disciplined by Ford for anti-apartheid activities outside of work, and employees active in workplace organizing were picked up by the police and security forces, questioned about their activities based on information supplied by Ford, and tortured and imprisoned.[82]   In this way, Ford intentionally supported the repression of anti-apartheid activists and purposefully cooperated with and benefited from government repression of blacks who supported unions.

### C.     Ford's "Withdrawal" from South Africa

After SAMCOR was created, Ford continued its operation in South Africa through SAMCOR.   As set forth above, the general manger of Ford South Africa became the head of SAMCOR.   Ford permitted this formally separate company to use its trade name and provided SAMCOR with parts, vehicles, managerial assistance, and capital derived from Ford's sale of its interests.   Nothing had changed except the names and stamps on boxes.   When apartheid ended, Ford stepped back into the place it claimed to have left.   These maneuvers reveal Ford's intention to maintain its business activities, including its support for and imposition of apartheid, while circumventing and undermining U.S. policy.

---

[79] "The Motor Industry in South Africa," at 15 (discussing import of carburetors).

[80] *Ntsebeza* Complaint, at ¶¶ 106-22.

[81] *Id.* at ¶¶ 119-21.

[82] *Id.* at ¶¶ 106-22.

## CONCLUSION

For the foregoing reasons Plaintiffs should be granted leave to amend.

Dated:  May 30, 2014

Respectfully submitted,

*/s/ Diane Sammons*
Diane Sammons
dsammons@nagelrice.com
Jay Rice
jrice@nagelrice.com
Nagel Rice, LLP
103 Eisenhower Parkway Suite 103
Roseland, NJ 07068
(973) 618-0400
Fax: (973) 618-9194
Counsel for Ntsebeza Plaintiffs

*/s/ Michael D. Hausfeld*
Michael D. Hausfeld
mhausfeld@hausfeldllp.com
Kristen M. Ward
kward@hausfeldllp.com
Hausfeld LLP
1700 K St. N.W. Suite 650
Washington, D.C. 20006
(202) 540-7200
Counsel for Balintulo Plaintiffs

Paul L. Hoffman
Schonbrun DeSimone Seplow Harris &
      Hoffman LLP
723 Ocean Front Walk
Venice, CA 90291

Judith Brown Chomsky
jchomsky@igc.org
Law Office of Judith Brown Chomsky
P.O. Box 29726 Elkins Park, PA 19027
(215) 782-8367
Fax: (215) 782-8368

26

Tyler R. Giannini
giannini@law.harvard.edu
Susan H. Farbstein
sfarbstein@law.harvard.edu
International Human Rights Clinic
Harvard Law School
6 Everett Street, Third Floor
Cambridge, MA 02138
(617) 496-7368

Jeannine M. Kenney
jkenney@hausfeldllp.com
Hausfeld LLP
1604 Locust St., 2nd Floor
Philadelphia, PA 19103
(215) 985-3270