UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

IN RE SOUTH AFRICAN APARTHEID
LITIGATION

02 MDL 1499 (SAS)

------------------------------------- X

This Document Relates to:

------------------------------------- X

LUNGISILE NTSEBEZA , *et al.*,
                Plaintiffs,
   -against-

FORD MOTOR COMPANY and
INTERNATIONAL BUSINESS
MACHINES  CORPORATION,

      Defendants.

02 Civ. 4712 (SAS)
02 Civ. 6218 (SAS)
02 Civ. 1024 (SAS)

------------------------------------- X

SAKWE BALINTULO, *et al.*,

           Plaintiffs,
   -against-

FORD MOTOR COMPANY and
INTERNATIONAL BUSINESS
MACHINES  CORPORATION,

      Defendants.

03 Civ. 4524 (SAS)

------------------------------------- X

## REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Table of Authorities ..................................................................................................ii

Introduction ..........................................................................................................1

Argument................................................................................................................1

   I.  Additional Facts Will Demonstrate That Plaintiffs' Claims Sufficiently
      "Touch and Concern" the United States ...........................................................1

   II. Plaintiffs Have Alleged Sufficient Facts to Meet the *Talisman* Purpose Standard.................6

Conclusion.............................................................................................................10

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Al Shimari v. CACI Premier Tech., Inc.*, 13-1937, 2014 WL 2922840
    (4th Cir. June 30, 2014). ...................................................................... 1,2,3,4

*Balintulo v. Daimler AG*, 727 F.3d 174 (2d Cir. 2013) ............................................. 1,2

*Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008) ................................................. 7

*Certain Underwriters, Subscribing To Policy Numbers DG055707, DG061908,*
    *4N65010001, RMP201072954 & PCA9002942-00*
    *v. Doncasters, Inc.,* 3:10-CV-00915, 2011 WL 1217169
    (D. Conn. Mar. 30, 2011)............................................................................. 7

*Cooper v. Trs. of Coll. of Holy Cross*, No. 13-Civ-8064, 2014 WL 2738545
    (S.D.N.Y. June 17, 2014) ............................................................................. 1

*Goldberg v. Rush University Medical Center*, 929 F. Supp. 2d 807, 822 (N.D. Ill. 2013)............. 7

*In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, (S.D.N.Y. 2009) ........................ 7

*Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 71 (2d Cir. 2014) ................................. 7

*Kiobel v. Royal Dutch Petroleum Co.,* 133 S. Ct. 1659 (2013)............................... 1,2,3,4

*Lev v. Arab Bank, PLC.,* No. 08-CV-3251, 2010 WL 623636 (E.D.N.Y. Jan. 29, 2010).............. 6

*Lipscomb v. Cronic*, 2:11-CV-78, 2011 WL 6755198 (N.D. Ga. Dec. 22, 2011).......................... 7

*Pentair Water Treatment (OH) Co. v. Cont'l Ins. Co.,* 08 CIV. 3604,
    2009 WL 1119409 (S.D.N.Y. Apr. 26, 2009)................................................... 7

*Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244 (2d Cir. 2009) ............. 1,6

*Sanders v. Grenadier Realty, Inc.,* No. 08-Civ-3920, 2009 WL 1270226
    (S.D.N.Y. May 6, 2009) ............................................................................. 1

*Segatt v. GSI Holding Corp.,* No. 07-Civ-11413, 2008 WL 4865033
    (S.D.N.Y. Nov. 3, 2008) ............................................................................. 1

*Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304 (D. Mass. 2013).......................... 4

**Other**

J.T. Radebe, MP, Minister of Justice and Constitutional Development
    to U.S. District Ct. Judge Shira A. Scheindlin, Sept. 1, 2009............................................4

*See Trial of Bruno Tesch and Two Others (The Zyklon B Case)*, 1 Law
    Reports of Trials of War Criminals 93 (1947)
    (British Military Ct., Hamburg, Mar. 1-8, 1946) ........................................................4, 7

**INTRODUCTION**

Plaintiffs' amended complaints[1] would include extensive new material facts and detailed allegations that plausibly demonstrate sufficient U.S.-based conduct to overcome the *Kiobel* presumption. *See Kiobel v. Royal Dutch Petroleum Co.,* 133 S. Ct. 1659 (2013). The new allegations would similarly demonstrate that Defendants purposefully assisted the South African government to violate international law. Plaintiffs' motion should therefore be granted.

**ARGUMENT**

**I.    ADDITIONAL FACTS WILL DEMONSTRATE THAT PLAINTIFFS' CLAIMS SUFFICIENTLY "TOUCH AND CONCERN" THE UNITED STATES**

In order to determine whether Plaintiffs' claims would be foreclosed by the presumption against extraterritoriality, this Court must apply the fact-based inquiry articulated by the Supreme Court in *Kiobel. See Kiobel,* 133 S. Ct. 1659; *Balintulo v. Daimler AG,* 727 F.3d 174 (2d Cir. 2013);[2] *see also Al Shimari v. CACI Premier Tech., Inc.,* 13-1937, 2014 WL 2922840

---

[1] The Court should grant Plaintiffs' Motion even though the proposed changes were detailed in the memorandum, rather than a proposed amended complaint. The Court's April 17, 2014 Order (Dkt. 156) did not require Plaintiffs to attach a proposed amended complaint, but only to make a "preliminary showing that they can plausibly plead" that Defendants' conduct overcomes *Kiobel*'s "touch and concern" standard, *see Kiobel,* 133 S. Ct. at 1669, and *Talisman*'s purpose standard, *see Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244, 259 (2d Cir. 2009). Plaintiffs' motion complied with the Court's Order. Nor is an attached proposed complaint required by Fed. R. Civ. P. 15(a)(2). This district has often permitted motions for leave to amend when no complaint is attached where "there is no undue prejudice to defendant." *Sanders v. Grenadier Realty, Inc.,* No. 08-Civ-3920, 2009 WL 1270226, at *4 (S.D.N.Y. May 6, 2009); *Segatt v. GSI Holding Corp.,* No. 07-Civ-11413, 2008 WL 4865033, at *4 (S.D.N.Y. Nov. 3, 2008). Plaintiffs are required only to "provide some factual detail or evidence as to the proposed amendment." *Cooper v. Trs. of Coll. of Holy Cross,* No. 13-Civ-8064, 2014 WL 2738545, at *10-11 (S.D.N.Y. June 17, 2014) (finding no undue prejudice when plaintiffs provided "the nature of the allegations" in their motion to amend).

[2] In their arguments about *Kiobel,* Defendants rely almost exclusively on the Second Circuit's opinion denying mandamus review in *Balintulo*. This reliance is misplaced because the Second Circuit's analysis was based on the very complaints that Plaintiffs seek to amend. Because the Court was examining Plaintiffs' past complaints without additional evidentiary presentations, or even significant briefing or argument, it concluded that there were no substantial U.S. connections. *Balintulo,* 727 F.3d at 188-189. This is not surprising given that the complaints

(4th Cir. June 30, 2014). As *Al Shimari* made clear, courts analyzing the *Kiobel* presumption must consider a broad range of facts regarding U.S. connection – not merely whether the harms were experienced abroad, *id.* at *10, 21, 25, as Defendants argue. Def. Br. at 3. On appeal, the Fourth Circuit found that plaintiffs' claims reflected "extensive 'relevant conduct' in United States territory, in contrast to the 'mere presence' of foreign corporations that was deemed insufficient in *Kiobel*." *Al Shimari,* 2014 WL 2922840 at *9. Concluding that plaintiffs' ATS claims sufficiently "touch and concern" the United States, the court's analysis involved factors also relevant here, including: (1) defendant's U.S. citizenship; (2) the U.S. citizenship of defendant's employees; (3) that defendant's contract had U.S. connections; and (4) allegations that defendant's managers tacitly approved the conduct, attempted to cover it up, and encouraged it. *Id.* at *12.

Defendants assert that Plaintiffs' new facts do not materially differ from the facts considered in *Balintulo.* Def. Br. at 3. This is simply inaccurate; while the pre-*Kiobel* complaints did generally discuss U.S. connections, the level of specificity now required by *Kiobel* was not included, as it was not necessary. Plaintiffs' opening brief offers an array of new details to demonstrate extensive "relevant conduct" by U.S. defendants inside the United States, similar to the conduct found sufficient in *Al Shimari,* and well beyond the "mere corporate presence" deemed insufficient in *Kiobel*. Indeed, the additional facts linked to the United States

---

were drafted and filed before the *Kiobel* presumption existed, at a time when plaintiffs were not required to allege U.S. connections with the level of specificity now required. However, the Second Circuit did not foreclose a post-*Kiobel* analysis applicable to complaints and evidentiary records that contain substantial U.S. contacts. *See Balintulo*, 727 F.3d at 193 n.28 (discussing other forms of liability that may arise with different facts). The new facts to be alleged in these cases indicate how the claims touch and concern the United States and undermine Defendants' reliance on the factual analysis in *Balintulo*. The Fourth Circuit's *Al Shimari* decision provides more appropriate guidance for analyzing the new facts in these cases.

are so extensive with regards to the involvement of the U.S. corporations that to deny jurisdiction would contradict the reasoning of *Kiobel* and *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014).[3]

In particular, the allegations demonstrate that two U.S. corporations were integral to the creation, maintenance, and enforcement of the apartheid regime -- and its attendant international law violations -- in South Africa. *See, e.g.*, Pl's. Br., Dkt. 274 at 20, 29; *Al Shimari,* 2014 WL 2922840 at *12 (finding defendant's status as U.S. corporation and employee's citizenship relevant to touch and concern analysis).  Policies and decisions made in the United States led to the sale of specialized vehicles to the South African military and police to suppress the black population, as well as to the creation and maintenance of an identity card system to denationalize the black population. *See, e.g.*, Dkt. 274 at 15, 29; *Al Shimari,* 2014 WL 2922840 at *12 (finding defendant's U.S. contact and allegations of management's tacit approval relevant to analysis).  The allegations also show that Defendants acted to circumvent clear U.S. congressional opposition to apartheid and attempted to conceal their actions, misleading the U.S. government as well as shareholders about the true nature of their activities in South Africa to minimize domestic criticism. *See, e.g.*, Dkt. 274 at 7, 16; *Al Shimari,* 2014 WL 2922840 at *12 (finding defendant's attempts to cover up and encourage misconduct relevant to analysis).  These were not the acts of renegade foreign subsidiaries.  This course of action was directed and approved by the U.S. parent corporations' management and boards.  These were high profile, sensitive matters requiring approval and supervision at the highest levels. *See, e.g.*, Dkt. 274 at 10-12, 24; *Al Shimari,* 2014 WL 2922840 at *12.  Finally, because Defendants are U.S. corporations, this case does not present potential problems associated with bringing foreign

---

[3] Dismissal would have the perverse effect of leaving Plaintiffs with no forum, contrary to the rationale of *Kiobel* and *Bauman,* which indicate the preference for home country jurisdiction.  In *Bauman*, the Court limited personal jurisdiction over subsidiaries of foreign corporations doing business in the United States for reasons similar to those undergirding the *Kiobel* presumption.

nationals into U.S. courts to answer for conduct committed abroad. *Id.* at *11; cf. *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 322-24 (D. Mass. 2013).[4]

Specifically, Ford exercised tight control over policy development and implementation, including those purposefully aimed at supporting human rights violations in South Africa. Given the sensitivity of investment in South Africa, Detroit was intimately and directly involved in critical transactions, making policy, management, investment, sales, and operational decisions that purposefully supported the apartheid state. *See, e.g.*, Pl's. Br., Dkt. 274 at 27 (discussing Detroit's involvement in a union leader's grievances). For example, the key decision to continue to sell to the South African military and police was not localized, but rather one made and controlled from the United States. Defendants' brief omits these core allegations, which tie the violations in South Africa not only to U.S. assistance and support, but also to direct U.S. control.

Although Congress clearly opposed apartheid, Ford sought to comply only with the technical letter of U.S. regulations and purposefully shifted supply chains outside the United States to continue its intentional support for the apartheid government. *Al Shimari,* 2014 WL 2922840 at *11 (noting that where political branches had already indicated that United States will not tolerate torture, litigation regarding alleged torture committed abroad would not interfere with foreign policy). In addition, Ford acted in the United States to ensure that U.S. sanctions would not be tightened in a way that would prevent sales to the South African government. Ford understood that vehicle sales to the South African military and police were problematic because Ford vehicles were essential to security forces committing human rights violations. The conduct

---

[4] Additionally, litigation of these claims will not require "unwarranted judicial interference in the conduct of foreign policy," *Kiobel*, 133 S. Ct. at 1664, because the U.S. government staunchly opposed apartheid, and the South African government has stated that it does not object to these cases proceeding in U.S. courts. *See* Letter from J.T. Radebe, MP, Minister of Justice and Constitutional Development to U.S. District Ct. Judge Shira A. Scheindlin, Sept. 1, 2009.

and decision to push back on sanctions were made in the United States. Thus, but for the U.S. conduct, Ford sales in South Africa would not have occurred as a matter of company policy.

Similarly, IBM was a highly centralized corporation that directed its business operations in South Africa from the United States. *Id.* at *12. Critical policy-level decisions were made in the United States, and the provision of expertise, management, technology, and equipment essential to the alleged abuses came from the United States. IBM did not have research and development capabilities, or manufacturing facilities, in South Africa. At all relevant times, complex computer hardware and software would have required customization in order to create the required identity documents. Indeed, the system needed to create and print identity documents required particular expertise and specialization that did not exist inside South Africa. Thus, but for IBM's U.S.-based involvement, the homeland identity card system could not have existed or functioned. *See, e.g.*, Pls. Br., Dkt. 274 at 14, 20.

In addition, in the United States, IBM opposed shareholder resolutions related to divestment and advocated for a sanctions regime that would allow it to support the South African government's implementation and enforcement of apartheid, thereby interfering with U.S. foreign policy goals. IBM repeatedly misled the U.S. government and its own shareholders about the true nature of its activities in South Africa to circumvent domestic criticism, for example by making plans to camouflage its operations through deceptions arranged with affiliates in other countries. At other times, IBM acknowledged that it intended to use overseas subsidiaries to supply the South African government and that it supplied non-U.S.-made parts to some embargoed South African agencies that were not permitted to receive U.S. equipment. Absent IBM's U.S.-based innovation, manufacturing of hardware and software, policies, and

decision-making, IBM's technology would not have been used to implement apartheid in South Africa through the homeland identity document system.

## II.   PLAINTIFFS HAVE ALLEGED SUFFICIENT FACTS TO MEET THE *TALISMAN* PURPOSE STANDARD

The allegations indicate that Defendants were not merely placing benign products into the marketplace, but rather were actively and deliberately targeting sales to facilitate human rights abuses. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009) (establishing purpose standard for *mens rea*). Defendants attempt to highlight their general business activities in South Africa, Def. Br. Dkt. 278 at 6, but obfuscate how they intentionally and purposefully supported specific violations of the rights of black South Africans. Rather than acting as an "indifferent provider of 'routine [ ] services," *Lev v. Arab Bank, PLC.*, No. 08-CV-3251, 2010 WL 623636, at *2 (E.D.N.Y. Jan. 29, 2010), the Defendants' involvement with the South African government had the very purpose of facilitating the crimes.

*Talisman* provides that the purpose standard can be inferred from the circumstances, and explains the fact-intensive nature of this *mens rea* inquiry. *See Talisman*, 582 F.3d at 264 ("[I]ntent must often be demonstrated by the circumstances, and there may well be an ATS case in which a genuine issue of fact as to a defendant's intent to aid and abet the principal could be inferred");[5] *see also Arab Bank*, 2010 WL 623636, at *2 (concluding purpose can be inferred from facts and finding defendant was not merely providing routine banking services to terrorist organizations, but purposefully aiding violations of international law). Crucially, *Talisman* was decided on a motion for summary judgment after complete discovery, and thus reinforces that discovery is proper before making a determination about the fact-intensive purpose standard.

---

[5] Plaintiffs maintain that the *mens rea* standard under international law is knowledge, not purpose, and wish to preserve that argument given recent developments in international law.

Even before discovery, however, the allegations here are sufficient.[6]  With respect to Ford, Defendant attempts to make much of the fact that specialized vehicles sold to the military and police also could have had a legitimate purpose. Def. Br. at 11. Ford's reliance on *Zyklon B*, however, demonstrates the failure in their logic. Ford posits that these cases are unlike *Zyklon B* because there were legitimate purposes for Ford sales to the government actors committing the international law violations.  But in *Zyklon B*, the gas had a legitimate use as well – to kill lice that could spread typhus.[7]  Indeed, the chemical was used for both purposes by the Nazi regime. *See Zyklon B*, 1 Law Reports of Trials of War Criminals 93, 98, 101.  At Nuremberg, the defendants were nonetheless convicted. *Id.*

The question is not whether there were both legitimate and illegitimate uses for Ford's products, but rather whether Ford purposefully assisted with the illegal act. *See In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 258 n.157 (S.D.N.Y. 2009) ("Although such goods may have legitimate uses, that issue is addressed by the *mens rea* element."). It would not have mattered if Zyklon B had applied warning labels or made statements or adopted written policies

---

[6] A plaintiff's pleading burden is significantly less than the burden of proof at the summary judgment stage, after the plaintiff has had the benefit of discovery.  Moreover, at the pleading stage many relevant facts for *mens rea* are within a defendant's sole possession.  Thus, at this stage, Plaintiffs need not allege the same degree of detail that would ordinarily be necessary to prove purpose. *See, e.g., Lipscomb v. Cronic*, 2:11-CV-78, 2011 WL 6755198, at *11 (N.D. Ga. Dec. 22, 2011) ("[I]n pleading the *mens rea* of the Defendants, it is unclear what else the Plaintiff could plead as those facts are within the Defendants' sole possession"); *Certain Underwriters, Subscribing To Policy Numbers DG055707, DG061908, 4N65010001, RMP201072954 & PCA9002942-00 v. Doncasters, Inc.*, 3:10-CV-00915, 2011 WL 1217169, at *5 (D. Conn. Mar. 30, 2011); *Pentair Water Treatment (OH) Co. v. Cont'l Ins. Co.*, 08 CIV. 3604, 2009 WL 1119409 at *5 (S.D.N.Y. Apr. 26, 2009); *Goldberg v. Rush University Medical Center*, 929 F. Supp. 2d 807, 822 (N.D. Ill. 2013); *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008) ("[E]ven in the context of Federal Rule of Civil Procedure 9's more stringent pleading requirements for pleading 'special matters,' we have held that allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge") (internal citations omitted); *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 71 (2d Cir. 2014).
[7] *See Trial of Bruno Tesch and Two Others (The Zyklon B Case)*, 1 Law Reports of Trials of War Criminals 93, 98, 101 (1947) (British Military Ct., Hamburg, Mar. 1-8, 1946).

indicating that the gas should be used for legitimate purposes, but then acted to purposefully assist in supplying gas to the Nazis to commit genocide. It is commonplace that criminal acts take place alongside legitimate business acts, as is the case, here, with the allegations against Ford. The company purposefully supported international law violations by selling specialized vehicles to the South African Special Branch, one of the most notorious security forces since the Nazi SS.

Ford's opposition to and circumvention of U.S. sanctions in order to maintain such sales underscores Ford's intent to aid such abuses. This was not a situation of Ford innocently putting vehicles into a marketplace. Rather, the company was making specific, intentional sales of specialized vehicles to security forces so that they could more effectively violate international law by suppressing, intimidating, and killing the black population. Furthermore, in the United States, Ford made the intentional decision to maintain sales that assisted in the commission of illegal acts in order to continue to curry favor with the South African government and maintain Ford's long term business interest. Pls. Br., Dkt. 274 at 30. In other words, Ford purposefully supported international law violations to facilitate other legitimate business. Ford's secondary legitimate purpose does not negate the *mens rea* associated with its illegal actions.

Finally, Ford's assertion that the allegations do not "establish more than 'the mere *possibility* of misconduct'" from vehicle sales is untenable. Defs. Br. at 11 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (emphasis added by defendants)). UN sanctions specifically targeting vehicle sales to the South African military and police had been in force since 1963. *See* Security Council Resolution 181, U.N. Doc. S/5386, at 1 (Aug. 9, 1963). Contrary to Ford's argument, it was much more than a "mere possibility" that Ford vehicles would assist in specific violations. Indeed, it was a recognized fact that vehicles were critical to carrying out the crimes

against humanity taking place in South Africa, and this recognition led to extensive sanctions to limit the sales precisely because they were known to contribute to abuse. Pls. Br. Dkt. 274 at 29. Similarly, it was more than a "mere possibility" that Ford's deliberate cooperation with the security forces would lead to the targeting and abuse of union activists employed at Ford plants. Ford repeatedly allowed the South African police and military to visit and enter the plants, and also supplied information to the security forces about employees' anti-apartheid activities. It was not simply possible, but rather to be expected, that the South African security forces would use such information as a pretext to target Ford employees for arrest, detention, and torture.

Like Ford, IBM did far more than provide "routine services" to South Africa. After bidding for a contract specifically meant to assist in the denationalization of black South Africans, IBM then purposely provided specialized hardware and software to create the ID system that would implement such denationalization. Pls. Br. Dkt. 274 at 18. Critically, computers and technology systems were complex operations at the time. Connecting computers and printers, and printing IDs with photographs, required significant customization. Such a system could not have been created or maintained but for purposeful intervention, approval, and support from the United States for the sales, the contract, and the technical specialization. These computers could not be taken out of a box and set up without IBM's active, deliberate, and purposeful U.S.-based support from the outset and through the life of the contract.

IBM makes several arguments in an attempt to show the company did not purposefully support apartheid-era abuses. All fail. First, IBM asserts that it had a normal business structure and control was routine. But the well-pled allegations show how IBM tightly controlled its South African operations from the United States, including control over hardware and software customization for the purpose of denationalization. Given the state of the computer industry at

the time, U.S.-based customization and support was required to maintain the technology in South Africa, where local expertise was lacking. Thus, in order to maintain its business and sales, IBM had to either fight adoption of a restrictive sanctions regime or circumvent that regime. In addition, IBM asserts that there is not a sufficient U.S. connection regarding the denationalization claims, stating there are no allegations about conduct in the United States. Defs. Br. Dkt. 278 at 16. However, Defendants rely on the old complaints and thus fail to respond to the new allegations about U.S.-based IBM conduct that actively led to the creation of a customized new identity book for the Bophuthatswana government. This product required U.S. customization of the software and hardware package. Pls. Br. Dkt. 274 at 13-14. In addition, the sale of the system to the homeland government was of a size—both in terms of the amount of the contract and the number of individuals affected—that IBM headquarters would have been involved in that decision, particularly given the sensitivity of supplying this type of technology to South Africa. Finally, IBM argues that Plaintiffs make no allegations of intent and that Plaintiffs concede there were legitimate purposes to the technology.[8] The allegations, however, are clear: IBM purposefully sought contracts that would facilitate the apartheid government's control and repression of the black population, and then executed those contracts in order to maintain this business in South Africa as well as to accomplish the goals of apartheid.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that their motion to amend be granted.

---

[8] Defendants' argument that the IDs were not inherently criminal or wrongful goes too far. The fact that the IDs were specifically printed with a new nationality is wrongful because it deprived the bearer of South African citizenship. The context changes what seems like a neutral act into a wrongful one. Just as a tattoo might be innocent, in the context of sorting prisoners in concentration camps, it is wrongful.

Dated: July 11, 2014                                              Respectfully submitted,

*/s/ Diane Sammons*
Diane Sammons
dsammons@nagelrice.com
Jay Rice
jrice@nagelrice.com
Nagel Rice, L.L.P.
103 Eisenhower Parkway Suite 101
Roseland, NJ 07068
(973) 535-3100
Fax: (973) 618-9194
Counsel for Ntsebeza Plaintiffs

*/s/ Michael D. Hausfeld*
Michael D. Hausfeld
mhausfeld@hausfeldllp.com
Kristen M. Ward
kward@hausfeldllp.com
Hausfeld LLP
1700 K St. N.W. Suite 650
Washington, D.C. 20006
(202) 540-7200
Counsel for Balintulo Plaintiffs

*/s/Paul L. Hoffman*
Paul L. Hoffman
Schonbrun DeSimone Seplow Harris &
Hoffman LLP
723 Ocean Front Walk
Venice, CA 90291

Judith Brown Chomsky
jchomsky@igc.org
Law Office of Judith Brown Chomsky
P.O. Box 29726
Elkins Park, PA 19027
(215) 782-8367
Fax: (215) 782-8368

Tyler R. Giannini
giannini@law.harvard.edu
Susan H. Farbstein
sfarbstein@law.harvard.edu
International Human Rights Clinic

Harvard Law School
6 Everett Street, Third Floor
Cambridge, MA 02138
(617) 496-7368

Jeannine M. Kenney
jkenney@hausfeldllp.com
Hausfeld LLP
1604 Locust St., 2nd Floor
Philadelphia, PA 19103
(215) 985-3270