UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

IN RE SOUTH AFRICAN APARTHEID
LITIGATION

------------------------------------------------------- X

This Document Relates to:

------------------------------------------------------- X

LUNGISILE NTSEBEZA, *et al.*,

        Plaintiffs,

   - against -

FORD MOTOR COMPANY, and
INTERNATIONAL BUSINESS
MACHINES CORPORATION,

        Defendants.

------------------------------------------------------- X

SAKEWE BALINTULO, *et al.*,

        Plaintiffs,

   - against -

FORD MOTOR COMPANY, and
INTERNATIONAL BUSINESS
MACHINES CORPORATION,

        Defendants.

------------------------------------------------------- X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
DOC #: _____
DATE FILED: 8/28/14

**OPINION AND ORDER**

**02 MDL 1499 (SAS)**

**02 Civ. 4712 (SAS)**
**02 Civ. 6218 (SAS)**
**03 Civ. 1024 (SAS)**

**03 Civ. 4524 (SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

This case arises out of allegations that various corporations aided and abetted violations of customary international law committed by the South African apartheid regime.  The remaining plaintiffs are members of two putative classes of black South Africans who were victims of apartheid-era violence and discrimination.  Plaintiffs seek relief under the Alien Tort Statute ("ATS"), which confers federal jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."[1]  The remaining defendants – Ford Motor Company ("Ford") and International Business Machines Corporation ("IBM") –  are American corporations accused of aiding and abetting violations of the ATS by manufacturing military vehicles and computers for South African security forces.  Plaintiffs move for leave to amend their complaints.    For the following reasons, plaintiffs' motion is DENIED.

## II.    BACKGROUND[2]

---

[1]    28 U.S.C. § 1350.

[2]    The complicated factual and procedural history of this litigation, which started with more than a dozen distinct cases of which two (the *Balintulo* case, and the *Ntsebeza* case, consisting of three consolidated actions) still remain, is summarized at length in *In re South African Apartheid Litig.*, 617 F. Supp. 2d 228, 241-45  (S.D.N.Y. 2009), *Balintulo v. Daimler AG*, 727 F.3d 174, 182-85 (2d Cir. 2013), and *In re South African Apartheid Litig.*, No. 02 MDL 1499, 2014 WL 1569423, at *1-3 (Apr. 17, 2014).  The following discussion is limited to the facts pertinent to this motion.

### A.    Procedural History

On April 8, 2009, I granted several defendants' motions to dismiss, but ruled that plaintiffs may proceed against Ford and IBM, as well as Rheinmettal AG and Daimler AG (the "April 8 Opinion and Order").  On August 14, 2009, defendants sought a writ of mandamus in the United States Court of Appeals for the Second Circuit to obtain interlocutory review of certain issues in the April 8 Opinion and Order.

On September 17, 2010, while this case remained pending, a split panel of the Second Circuit held in *Kiobel v. Royal Dutch Petroleum Co.* that the ATS does not confer jurisdiction over claims against corporations, and dismissed the ATS claims of Nigerian nationals who alleged that various corporations aided and abetted customary international law violations in Nigeria ("*Kiobel I*").[3]  The Second Circuit's decision in this case was stayed pending the resolution of *Kiobel* in the Supreme Court.  On April 17, 2013, after two rounds of briefing and oral argument, the Supreme Court affirmed the judgment of dismissal in *Kiobel* without addressing the issue of corporate liability ("*Kiobel II*").  Rather, the Supreme Court held that the "presumption against extraterritoriality applies to claims under the

---

[3]        *See Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 148 (2d Cir. 2010) ("*Kiobel I*") (Cabranes, J. and Jacobs, C.J.) (Leval, J. concurring in the judgment of the court to dismiss the complaint but filing separate opinion accepting corporate liability under the ATS).

ATS" and bars actions "for violations of the law of nations occurring outside the United States."[4]

On April 19, 2013, two days after *Kiobel II*, the Second Circuit directed the parties in this case to provide supplemental briefing on the impact of the Supreme Court's decision.  On August 21, 2013, the court denied defendants' request for a writ of mandamus and remanded to the district court.  The court stated that"[t]he opinion of the Supreme Court in *Kiobel* [*II*] plainly bar[red] common-law suits like this one, alleging violations of customary international law based solely on conduct occurring abroad."[5]  Applying the Supreme Court's holding in *Kiobel II*, the Second Circuit concluded that the ATS does not "recognize causes of action based solely on conduct occurring within the territory of another sovereign," and that plaintiffs' suit should be dismissed "[b]ecause the defendants' putative agents did not commit any relevant conduct within the United States giving rise to a violation of customary international law."[6]  On November 7, 2013, the court denied plaintiffs' petition for panel rehearing and rehearing en banc.

Following denial of en banc review, defendants asked this Court to

---

[4]    *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1663 (2012) ("*Kiobel II*").

[5]    *Balintulo*, 727 F.3d at 182.

[6]    *Id*. at 192.

enter judgment in their favor based on the Second Circuit's directive, and based on

their view that there is no corporate liability for ATS claims based on the Second

Circuit decision in *Kiobel I*.  Plaintiffs sought leave to amend their complaints,

arguing that the Second Circuit's decision in *Balintulo* was based on complaints

drafted before *Kiobel II* and that plaintiffs are entitled to an opportunity to allege

additional facts that might show that some of the alleged wrongful conduct

"'touch[es] and concern[s]'" the United States with "'sufficient force'" to

overcome the presumption against extraterritorial application of the ATS.[7]

Plaintiffs also maintained that corporations are proper defendants because the

Supreme Court implicitly overturned the Second Circuit's decision in *Kiobel I*

finding no corporate liability under the ATS.

On December 26, 2013, I dismissed the remaining foreign defendants

– Rheinmettal AG and Daimler AG – because "plaintiffs have failed to show that

they could plausibly plead that the[ir] actions . . . touch and concern the United

States with sufficient force to rebut the presumption against the extraterritorial

reach of the ATS."[8]  I also ordered the remaining parties to fully brief the question

---

[7]      11/26/13 Letter from Diane E. Sammons, counsel for plaintiffs to the Court, at 2 (quoting *Kiobel*, 133 S. Ct. at 1669).

[8]      *In re South African Apartheid Litig.,* No. 02 MDL 1499, 2013 WL 6813877, at *2 (Dec. 26, 2013).

of whether corporations can be held liable under the ATS following the Supreme Court's decision in *Kiobel II*. On April 17, 2014, I held that because the Supreme Court implicitly overruled the Second Circuit's decision in *Kiobel I*, the question of corporate liability remained open in the Second Circuit,[9] and concluded that actions under the ATS can be brought against corporations.[10] I permitted plaintiffs to move for leave to amend against the remaining American defendants, in which they would have to plead "that those defendants engaged in actions that 'touch and concern' the United States with sufficient force to overcome the presumption against the extraterritorial reach of the ATS."[11]

---

[9] *See In re South African Apartheid Litig.*, 2014 WL 1569423, at *5 (citing *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 174 (2d Cir. 2013) and *Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 49 n.6 (2d Cir. 2014) (Pooler, J., concurring)).

[10] *See id.* at *8-9 (citing *Flomo v. Firestone Natural Rubber Co.*, 643 F.3d 1013, 1017-19 (7th Cir. 2011)).

[11] *Id.* at *9. Plaintiffs were also permitted to allege new facts showing "that those defendants acted not only with knowledge but with the purpose to aid and abet the South African regime's tortious conduct." *Id.* This heightened *mens rea* requirement for aiding and abetting liability under the ATS was established by *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009). Because plaintiffs have failed to show that they could plausibly plead facts to overcome the presumption against extraterritoriality, I will not address whether the proposed amended complaint meets the extraordinarily high *Talisman Energy* standard.

### B.   Factual History[12]

#### 1.   Allegations Against IBM

IBM is a United States corporation headquartered in New York.[13]
IBM South Africa was a wholly owned subsidiary of IBM.[14]  Plaintiffs allege that
IBM, through its South African subsidiary, "intentionally developed and provided
computer technology, systems, software, training, and support to purposefully
facilitate and enable the apartheid government's control of the majority black
population, including the physical separation of the races."[15]  For example, IBM's
South African subsidiary "purposely pursued contracts that supported the
implementation of apartheid, including the 'Book of Life' and the Bantustan

---

[12]     For purposes of this section, I will discuss only the facts underlying
plaintiffs' aiding and abetting claims against Ford and IBM.  I will not discuss, in
detail, the general history of the apartheid regime or the primary violations alleged
by plaintiffs, as these facts are fully laid out in previous opinions.  The facts are
drawn from Plaintiffs' Memorandum of Law in Support of the Motion for Leave to
File Amended Complaints ("Pl. Mem.") and the proposed amended complaints
("Prop. Balintulo Compl." and "Prop. Ntsebeza Compl.").  Well-pleaded factual
allegations are presumed true for the purposes of this motion.  *See Ashcroft v.
Iqbal*, 556 U.S. 662, 679 (2009).  However, allegations in the proposed amended
complaints that consist of conclusory statements or threadbare recitals of causes of
action are not entitled to the presumption of truth.  *See Kirkendall v. Halliburton*,
707 F.3d 173, 175 n.1 (2d Cir. 2013).

[13]     *See* Prop. Balintulo Compl. ¶ 136 and Prop. Ntsebeza Compl. ¶ 122.

[14]     *See* Prop. Balintulo Compl. ¶ 135 and Prop. Ntsebeza Compl. ¶ 125.

[15]     Prop. Ntsebeza Compl. ¶ 135.  *Accord* Prop. Balintulo Compl. ¶ 171.

identity documents."[16]

Nevertheless, plaintiffs allege that "[a]t all relevant times, the code of business conduct, standards, and values for IBM directors, executive officers, and employees globally were set by IBM in the United States."[17]  "IBM in the United States made key decisions about operations in South Africa, including investments, policy, management, bids and contracts, hardware and software products and customization, as well as services and maintenance."[18]  "IBM did not have research and development or manufacturing facilities in South Africa.  Rather, IBM, in the United States, conducted the research and development for the hardware and software that supported the apartheid systems."[19]

Plaintiffs further allege that "[i]n the United States, IBM opposed shareholder resolutions related to divestment and advocated for a sanctions regime

---

[16]     Pl. Mem. at 14.  The "Book of Life" was a mandatory passbook that "contained assorted information including racial classification, name, sex, date of birth, residence, photograph, marital status, driver license number, dates of travel . . . , place of work or study, and finger prints." *Id*. at 16.  Bantustans were "independent" territories created in order to strip black South Africans of their citizenship, "impos[ing] new identity documents and passports on those who were denationalized." *Id*. at 14.  *Accord* Prop. Balintulo Compl. ¶¶ 171-201 and Prop. Ntsebeza Compl. ¶¶ 139-160.

[17]     Pl. Mem. at 6.

[18]     Prop. Ntsebeza Compl. ¶ 127.

[19]     *Id*. ¶ 131.

that would allow it to support the South African government's implementation and enforcement of apartheid, thereby interfering with U.S. foreign policy."[20]  "IBM repeatedly misled the U.S. government and its own shareholders about the true nature of its activities in South Africa to circumvent domestic criticism."[21]  Finally, "[a]lthough IBM formally withdrew from South Africa in 1987, it intentionally continued its support for apartheid and denationalization" by selling its South African subsidiary to another company, who in essence, continued to operate as an alter ego, and to use products with IBM's patents.[22]  In sum, plaintiffs allege that "IBM pursued business in South Africa in a manner directly contrary to the intent of the U.S. embargo and sanctions regime, as well as international law."[23]

### 2.   Allegations Against Ford

"Ford is an American multinational automaker incorporated in the United States and based in Dearborn, Michigan."[24]  "Ford Motor Company of South Africa Ltd ("Ford South Africa"). . . . was a wholly owned subsidiary of Ford Motor Company of Canada, Ltd. ("Ford Canada"), which was itself 76%

---

[20]   Pl. Mem. at 8-9.

[21]   *Id*. at 10.

[22]   Pl. Mem. at 17-18.

[23]   Prop. Ntsebeza Compl. ¶ 139.

[24]   *Id*. ¶ 66.

owned by Ford."[25]  "In 1985, Ford merged a subsidiary of Ford Canada with Amcar Motor Holdings, a unit of the Anglo American Corporation, to form the South African Motor Corporation ("SAMCOR").  After the merger, Ford had a 42% stake in SAMCOR."[26]  Two years later, Ford sold its share in SAMCOR but "allowed SAMCOR to continue 'to use its trade name and . . . provided parts, vehicles, and management assistance.'"[27]

Ford, through Ford South Africa and SAMCOR, "had a long record of strategic vehicle and parts sales to the South African security forces during apartheid.  Ford's vehicles were used by the South African security forces to patrol African townships, homelands, and other areas, as well as to arrest, detain, and assault suspected dissidents, violators of pass laws, and other civilians."[28] "Despite [United States] prohibitions [on the sale of cars to South African security forces in 1978], Ford continued to supply vehicles . . . on the basis that the vehicles did not

---

[25]    Pl. Mem. at 18.

[26]    *Id*. at 18-19.

[27]    *Id*. at 19.  In 2000, Ford purchased a majority stakehold in SAMCOR, and renamed it Ford of South Africa.  *See id.*

[28]    Prop. Balintulo Compl. ¶ 251.  For example, "[b]etween 1973 and 1977, Ford sold 128 cars and 683 trucks directly to the South African Ministry of Defense and 646 cars and 1,473 trucks to the South African police." Prop. Ntsebeza Compl.  ¶ 84(B).

contain parts or technical data of U.S. origin."[29]   Plaintiffs further allege that Ford

sold "specialized" vehicles that "were more powerful than . . . other cars, and . . .

were only made for the security forces."[30]   Additionally, plaintiffs claim that

"South African police and military regularly visited and entered the [South

African] plants" and that "[e]mployees in the South African plants were disciplined

. . . for anti-apartheid activities outside of work."[31]

Plaintiffs allege that Ford made "key decisions about investments,

policy, and operations in South Africa" in the United States, even after "the

tightening of U.S. trade sanctions in February 1978."[32]   "Ford's U.S. headquarters

controlled its major global policies, which applied to South Africa, including

employment policies, ethical business policies, and codes of conduct."[33]   "Ford, in

---

[29]     Prop. Balintulo Compl. ¶ 258.

[30]     Prop. Ntsebeza Compl.  ¶ 84(F).

[31]     Pl. Mem. at 24-25.

[32]     *Id.* at 20.  Plaintiffs allege certain specific examples, such as the transfer of management personnel between Ford offices in the United States, Europe, Canada, Asia and South Africa, infusion of capital into the South African subsidiary, United States design and development of products eventually sold in South Africa, maintenance of records on South African employees, and involvement in labor relations and negotiations with foreign plants. *See, e.g.*, Prop. Ntsebeza Compl. ¶¶ 71-76.

[33]     Prop. Ntsebeza Compl.  ¶ 75.  For example, Ford "adopted the Sullivan Principles regarding operations in South Africa and claimed that it would implement the principles of non-segregation and equality of wages in its South

the United States, decided to and did oppose efforts in the United States and South Africa that would end sales to the South African Security forces, because doing otherwise might have harmed Ford's business interests."[34]  "Ford sought to comply only with the technical letter of U.S. regulations but purposefully shifted supply chains outside the United States [to Canada and England, specifically] to circumvent their intent and deliberately support the apartheid government."[35]

## III.   APPLICABLE LAW

### A.   Leave to Amend

Whether to permit a plaintiff to amend a complaint is a matter "'within the sound discretion of the district court.'"[36]  Federal Rule of Civil Procedure 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires."[37]  Leave to amend should be denied, however, where the

---

African operations."  *Id.* ¶ 73(B).

[34]    *Id.* ¶ 82.

[35]    Pl. Mem. at 21.

[36]    *Franconero v. UMG Recordings,* Inc., 542 Fed. App'x 14, 17 (2d Cir. 2013) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).

[37]    Fed. R. Civ. P. 15(a).

proposed amendment would be futile.[38]

## B.    Presumption Against Extraterritorial Application of the ATS

The Supreme Court's decision in *Kiobel II* drastically limits the viability of ATS claims based on conduct occurring abroad.  The Court concluded that "the presumption against extraterritoriality applies to claims under the ATS, [] that nothing in the statute rebuts that presumption[,] and [that the] petitioners' case seeking relief for violations of the law of nations occurring outside the United States is barred."[39]  The Court justified its decision to affirm the Second Circuit's judgment by noting that "all the relevant conduct [in *Kiobel*] took place outside the United States."[40]  However, the Court left open the possibility that certain "claims [may] touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application" of the ATS.[41]

---

[38]    *See TechnoMarine SA v. Giftports, Inc.*, – F.3d –, 2014 WL 3408570, at *9 (2d Cir. July 14, 2014) ("A plaintiff need not be given leave to amend if it fails to specify . . . how amendment would cure the pleading deficiencies in its complaint.").  *See also Hayden v. County of Nassau*, 180 F.3d 42, 53–54 (2d Cir. 1999) ("[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied.").

[39]    *Kiobel II*, 133 S. Ct. at 1669.

[40]    *Id.*

[41]    *Id.*

The operative terms in this discussion – "relevant conduct," "touch and concern," and "sufficient force" – are left undefined by the majority opinion, except a clarification that "it would reach too far to say that mere corporate presence suffices."[42]  Two concurring opinions – one by Justice Alito, joined by Justice Thomas, and one by Justice Breyer, joined by Justices Ginsburg, Sotomayor, and Kagan – offer competing views.  Under Justice Alito's view, the presumption against extraterritorial application can be rebutted *only* if conduct within the United States is itself "sufficient to violate an international law norm."[43] Under Justice Breyer's view, the presumption can be rebutted if "(1) the alleged tort occurs on American soil, (2) the defendant is an American national, or (3) the defendant's conduct substantially and adversely affects an important American national interest."[44]

The Second Circuit's opinion in *this* case – *Balintulo v. Daimler* – was the first court of appeals case to interpret these important terms.  The court explicitly rejected Justice Breyer's formulation.[45]  First, it concluded that

---

[42]    *Id*.

[43]    *Id*. at 1670 (Alito, J., concurring).

[44]    *Id*. at 1674 (Breyer, J., concurring).

[45]    *See Balintulo*, 727 F.3d at 189.

14

"corporate citizenship" in the United States is an "irrelevant factual distinction[]," when "all of the relevant conduct occurred abroad."[46]  Second, it concluded that "the compelling American interests in supporting the struggle against apartheid in South Africa" equally "miss the mark" because the presumption against extraterritoriality is a question of statutory interpretation, not judicial weighing of national interests.[47]

Finally, the court rejected plaintiffs' argument that defendants' control over its foreign subsidiaries or its "affirmative steps in this country to circumvent the sanctions regime," including "continu[ing] to supply the South African government with their products, notwithstanding various legal restrictions against trade with South Africa," are sufficient to "tie[] the relevant human rights violations to actions taken within the United States."[48]  The court concluded that such allegations could only make out a claim of "vicarious liability of the defendant corporations based on the actions taken *within* South Africa *by* their South African subsidiaries" and "[d]efendants *cannot be vicariously liable* for that

---

[46]     *Id*. at 190.

[47]     *Id*. at 192.

[48]     *Id*.

conduct under the ATS."[49]  Thus, "the ATS does not . . . recognize causes of action

based solely on conduct occurring within the territory of another sovereign . . . and

does not permit claims based on illegal conduct that occurred entirely in the

territory of another sovereign."[50]  In sum, *Balintulo* requires plaintiffs to plead

"relevant conduct within the United States" that itself "give rise to a violation of

customary international law" – in other words, the position adopted by Justice

Alito.[51]

## IV.   DISCUSSION

Despite plaintiffs' tenacious effort to revive this litigation, the bar set

by the Supreme Court in *Kiobel II*, and raised by the Second Circuit in *Balintulo*, is

too high to overcome.  Defendants argue, and plaintiffs cannot plausibly deny, that

while the newly proposed allegations are substantially more detailed and specific,

the *theories* of the American corporations' liability are "essentially the same as

those in plaintiffs' existing complaints."[52]

Plaintiffs argue that "the two U.S. corporations were integral to the

---

[49]     *Id.* (emphasis added).

[50]     *Id.*

[51]     *Id.*

[52]     Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion
for Leave to Amend Their Complaints, at 12.

creation, maintenance, and enforcement of the apartheid regime – and its attendant international law violations" because "[c]ritical policy-level decisions were made in the United States, and the provision of expertise, management, technology, and equipment essential to the alleged abuses came from the United States."[53] Although now supported with detailed facts, this theory of liability was already rejected by the Second Circuit in *Balintulo* as establishing vicarious liability at most, and therefore being insufficient to overcome *Kiobel II*'s presumption against extraterritoriality.  The *Balintulo* court also rejected plaintiffs' effort to tie the international law violations to the "affirmative steps" defendants "took . . . in this country to circumvent the sanctions regime."[54]

Plaintiffs urge this Court to reject *Balintulo* and follow a recent Fourth Circuit case, *Al-Shimari v. CACI Premier Technology, Inc.*[55]  In *Al-Shimari*, the Fourth Circuit concluded that plaintiffs' claims against an American private military contractor for abuse and torture during their detention at Abu Ghraib "touched and concerned" the territory of the United States with sufficient force to

---

[53]   Plaintiffs' Reply Memorandum of Law in Support of Their Motion for Leave to Amend, at 3-5.

[54]   *Balintulo*, 727 F.3d at 192 ("None of these [allegations] ties the relevant human rights violations to actions taken within the United States.").

[55]   – F.3d –, 2014 WL 2922840 (4th Cir. June 30, 2014).

rebut the presumption.  The Fourth Circuit reached that conclusion because plaintiffs' allegations involved "the performance of a contract executed by a United States corporation with the United States government," "acts of torture committed by United States citizens who were employed by an American corporation . . . . at a military facility operated by United States government personnel," and "attempt[s] to 'cover up' the misconduct" by the contractors' managers located in the United States.[56]  "In addition, the employees who allegedly participated in the acts of torture were hired . . . in the United States . . . and were required to obtain security clearances from the United States Department of Defense."[57]

Even apart from my obligation to follow *Balintulo* as controlling law in the Circuit and as the law of the case, the facts in *Al-Shimari* are clearly different than the facts in this case and involve much greater contact with the United States government, military, citizens, and territory.  Here, any alleged violation of international law norms was inflicted by the South African subsidiaries over whom the American defendant corporations may have exercised authority and control. While corporations are typically liable in tort for the actions of their putative

---

[56]     *Id*. at *9-10.

[57]     *Id*. at *10.

agents, the underlying tort must itself be actionable.  However, plaintiffs have no valid cause of action against the South African subsidiaries under *Kiobel II* because all of the subsidiaries' conduct undisputedly occurred abroad**.**  Thus, even the *Al-Shimari* court implicitly accepted *Balintulo*'s conclusion that ATS jurisdiction does not extend "to claims involving foreign conduct by [foreign] subsidiaries of American corporations."[58]

That these plaintiffs are left without relief in an American court is regrettable.  But I am bound to follow *Kiobel II* and *Balintulo*, no matter what my personal view of the law may be.  Even if accepted as true, the "relevant conduct" alleged in plaintiffs' proposed amended complaints all occurred abroad.  Thus, under the law of the Supreme Court and of the Second Circuit, the claims do not touch and concern the territory of the United States "with sufficient force to displace the presumption against extraterritorial application," and would not survive a motion to dismiss.[59]

## V.   CONCLUSION

For these reasons, plaintiffs' motion for leave to amend their

---

[58]     *Id*. ("The[] ties to the territory of the United States [in this case] are far greater than those considered recently by the Second Circuit in *Balintulo v. Daimler AG*.").

[59]     *Kiobel II*, 133 S. Ct. at 1669.

complaints is DENIED.  All remaining claims against Ford and IBM are

DISMISSED with prejudice.  The Clerk of the Court is directed to close this

motion and these cases.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            August 28, 2014

## - Appearances -

**For Plaintiffs Ntsebeza *et al.*:**

Bruce Heller Nagel, Esq.
Jay J. Rice, Esq.
Diane E. Sammons, Esq.
Nagel Rice LLP
103 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 618-0400

Tyler R. Giannini, Esq.
International Human Rights Clinic
Harvard Law School
Pound Hall Room 401
1563 Massachusetts Avenue
Cambridge, Massachusetts 02138
(617) 495-9362

Linda P. Nussbaum, Esq.
Grant & Eisenhofer
485 Lexington Avenue
New York, New York, 10017
(646) 722-8504

Paul L. Hoffman, Esq.
Schonbrun DeSimone Seplow Harris
& Hoffman
723 Ocean Front Walk
Venice, California 90291
(310) 396-0731

Judith Brown Chomsky, Esq.
Law Offices of Judith Brown
Chomsky
Post Office Box 29726
Elkins Park, Pennsylvania 19027
(215) 782-8367

Michael F. Osborne, Esq.
56 Keerom Street
Cape Town 08001
South Africa
558-7221

**For Plaintiffs Balintulo *et al.*:**

Michael D. Hausfeld, Esq.
Hausfeld LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
(202) 579-1089

Carroll H. Ingram, Esq.
Ingram Wilkinson
P.O. Box 15039
Hattiesburg, Mississippi 39404
(601) 261-1385

**For Defendant International
Business Machines Corp.:**

Keith R. Hummel, Esq.
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, New York 10019
(212) 474-1000

**For Defendant Ford Motor
Company:**

Jonathan Hacker, Esq.
O'Melveny & Myers LLP
1625 I Street, NW
Washington, DC 20006
(202) 383-5300